ALBERT G. WEED ET AL., EXECUTORS AND TRUSTEES, *vs.*
SELINA E. SCOFIELD ET AL.

Third Judicial District, Bridgeport, April Term, 1901.
ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

In the construction of a will the question always is, not what the testator meant to say, but what is meant by what he did say.

The probability on which a devise or bequest by implication is rested must be apparent and not a mere matter of conjecture, but it need not, even as against the heir at law, necessarily be so strong that from the words employed an intention to the contrary cannot be supposed.

The meaning of a testator's words is not changed because, after they were written, a certain event did or did not occur.

After directing the payment of his debts and giving $500 in trust to a cemetery association for the care of his burial lot, the testator directed his executors to place such an amount at interest as would be sufficient to provide an annual income of $600, which was to be applied to the support of *M* (then 78 years old) during her life, and to the payment of her funeral expenses, and authorized them, in case *M* should by prolonged disability or illness require more, to add such an amount as they deemed necessary. A similar provision of $400 per annum was made for the support of *W* during his life, and the payment of his funeral expenses. *W* died shortly after the testator. Following this were bequests of specified sums of money to several individuals and to religious and benevolent societies, amounting in all to $66,000, and the 37th clause of the will then provided that if, after paying all the individual legacies, there could not be realized enough to pay in full the charitable bequests, these should abate *pro rata*, but if more than enough, there should be a proportional increase in all the legacies given to individuals and societies. At the date of the will the testator's property, of which $20,000 was realty, was worth about $95,000, and at his decease about $100,000. The executors were given a full power of sale, and had set aside $18,000 as a trust fund for *M* and $10,000 for *W*. In a suit to construe the will it was *held :* —

1. That the principal of these two funds was not intestate property, as contended by the heirs at law, but formed part of the residue of the testator's estate and went, under the 37th clause of the will, to augment all the pecuniary legacies except that given to the cemetery association and those for the benefit of *M* and *W*.

2. That inasmuch as all parties were agreed that $15,000 was sufficient to produce the required income of $600 a year for *M's* support, the reservation of a larger amount for that purpose was unauthorized.

3. That all income from that fund in excess of $600 in any year should be added to the principal.

4. That the funeral expenses of *M* and of *W* were chargeable to the principal, and to any accumulations of income thereon, of their respective trust funds.

5. That any extra amount which in the judgment of the executors might be needed for *M's* support, was to be taken from the principal of her fund or the accumulated income thereon.

The testator gave a legacy to the "Institution for the Relief of the Ruptured and Crippled in the City of New York." There was no institution of that name, but there was a corporation named The New York Society for the Relief of the Ruptured and Crippled. *Held* that the last-named corporation was entitled to the legacy, on proof that it was the intended legatee.

· Argued April 23d—decided May 8th, 1901.

SUIT to determine the validity and construction of the will of John P. Hamilton of Stamford, deceased, brought to the Superior Court in Fairfield County and reserved by that court, *Robinson, J.,* upon an agreed finding of facts, for the consideration and advice of this court.

The provisions in question were as follows : "After all my just debts (including my funeral expenses are fully paid and discharged after my decease) I give and bequeath to the several individuals, and religious and benevolent societies and institutions hereinafter named, the several sums or amounts named to each of them as follows, viz : —

"1. I give and bequeath to the Greenwood Cemetery in the City of Brooklyn, New York, the sum of five hundred (500) dollars, in trust (in addition to what I have already given) the interest of the same to be applied to the care, preservation and repairs of the grounds, fences, monuments, etc. on my lot, No. 1520, in said cemetery (which lot was conveyed to me by the said Greenwood Cemetery by deed bearing date the 22d of October, 1846), to have and to hold the said lot of land to the said the Greenwood Cemetery and its successors, for the purposes mentioned in the third section of the Act of the legislature of the State of New York, entitled "An Act further to amend ' An Act to incorporate the Greenwood Cemetery '" passed April 18th, 1838—passed April 5th, 1850. And I hereby designate and prescribe, pursuant to

the said Act, that the remains of Ann Morris be interred in the front corner of said lot. And the remains of myself, by the side of my deceased wife, and that interments in said lot be restricted to the persons so designated, and that said lot of land shall be hereafter inalienable.

" 2. I hereby order and direct my executors hereinafter named, to place an amount at interest sufficient to provide an annual interest or income of six hundred (600) dollars, the said interest to be applied to the support of Ann Morris during her natural life, the same to be paid monthly or quarterly as may seem to them best. And also after her decease, to pay her funeral expenses, and if by unusual or prolonged disability or illness, the said sum should not be sufficient, then they may add such a reasonable amount as may seem to them to be absolutely necessary.

" 3. I hereby further order and direct that my executors shall place an additional amount at interest, sufficient to provide an annual interest or income of four hundred (400) dollars, the said interest to be applied to the support of Nathaniel H. Weed, during his natural life, the same to be paid in monthly or quarterly payments as may seem to them best, and after his decease to pay his funeral expenses."

Other bequests followed, of specified sums of money to sundry individuals and to sundry religious and benevolent societies and institutions, amounting in all to $66,000. One of these was to the Institution for the Relief of the Ruptured and Crippled in the City of New York.

Small specific bequests of sundry articles of household or personal use or ornament were then made to several of the individuals before named as general legatees, after which were these provisions in the 37th clause : —

" But if it shall appear after my decease that there cannot be realized a sufficient amount after paying all the individual legacies, to pay the full amounts of the sums named to each of the religious and benevolent societies and institutions, hereinbefore named, then there shall be deducted from each of the said societies and institutions an amount, *pro rata*, or according to the several amounts so named to each one of them.

" But if it shall be found that there will be an excess of the amount required, then there shall be added to the amounts or sums to be paid to all the said individuals, societies and institutions, an amount *pro rata*, or in proportion to the amount or sums, so given to each."

A full power of sale was given to the executors.

At the date of said will the testator was familiar with the character and value of his property, which consisted of real and personal estate worth about $95,000; $20,000 of which was realty. Said estate remained substantially the same in character and value to the time of the testator's death.

An administration account of the executors was duly filed and allowed by the Court of Probate, in which they charged themselves with assets (including said real estate) to the amount of $101,900, credited themselves with having discharged in full all the legacies to individuals and that to Greenwood Cemetery, and showed a balance on hand a little more than sufficient to satisfy all the other legacies. In this account $18,000 was credited as " estate bequeathed to executors to provide an annual income of $600 for support of Ann Morris, and such additional income as may be necessary for her support, and for payment of her funeral expenses as provided by second clause of will," and $10,000 as set apart for the legacy in favor of Nathaniel H. Weed. The latter died shortly after the testator.

There is no institution nor corporation in the city of New York known as " the Institution for the Relief of the Ruptured and Crippled in the City of New York," but there is a corporation there named " The New York Society for the Relief of the Ruptured and Crippled." It was agreed by all parties that this was the institution which the testator intended to designate.

The heirs at law of the testator were first cousins of the half blood, and several of them were given legacies in the will.

*Edwin L. Scofield,* for the plaintiffs.

*Roger Welles,* for the American Bible Society.

*Philip P. Wells,* for the American Seamen's Friend Society.

*Nathaniel R. Hart,* for Ann Morris et al.

*Samuel Young,* for the American Tract Society.

*Clarence E. Bacon,* for the Connecticut Industrial School for Girls.

*Goodwin Stoddard* and *Arthur M. Marsh,* for the heirs at law.

BALDWIN, J.   It was the testator's intent that his bequests to individuals should be first discharged, and then that if his remaining estate should prove insufficient to satisfy all his charitable bequests, these should abate *pro rata;* but that if it should prove more than sufficient to satisfy them, the excess should be applied to increase *pro rata* the amounts to be paid to all those receiving pecuniary legacies.

It is argued in behalf of the heirs, that in making these provisions he had in view only the amount to be " realized" by turning his estate into money, as compared with the aggregate amount of all his pecuniary legacies, and so that he has made no direction as respects the principal set apart for the Morris and Weed trust funds, for its disposition after the expiration of the life estates.   To support this position they urge that an heir is not to be cut off by implication, unless it be a necessary one, resting on so strong a probability that an intention to the contrary cannot be supposed.

Every will is in derogation of what otherwise would be the right of inheritance.   If a devise to the heir at law give him no more than he would have without it, it is treated as of no effect, and he takes by descent.   *Ellis* v. *Page,* 7 Cush. 161. If it does give him more, he inherits so much the less.   He can be excluded from any share of the estate if the testator so wishes and provides; and whether such a provision be ef-

fectual or not must always depend primarily on the reasonable meaning of the language used.

The proposition asserted to be a rule of law governing the case at bar has received the countenance of leading writers on the subject of wills. 2 Jar. on Wills, *1654; Pow. on Dev. *411. See also 1 Blackst. Comm. 450. It embodies expressions which have been used by great judges in the decision of cases. But nevertheless it is, in the form stated, unsound and misleading.

The germ of this doctrine is to be found in an English case decided in 1633, in which it was held that the heir was not to be disinherited by ambiguous and doubtful provisions. *Spirt* v. *Bence*, Croke, Car. I, 369. Chief Justice Vaughan, later in the same century, declared that to cut off an heir by implication, the implication must be a necessary one, and the provision not "any way doubtful." *Gardner* v. *Sheldon*, Vaugh. 259, 262, 268. In 1701, Chief Justice Trevor defined such a "necessary implication" as being one without which the words of the devise "would be rejected as void, and of no sense or signification." *Shaw* v. *Bull*, 12 Mod. 593, 597.

Chief Justice Willes, when he came upon the bench of the Court of Common Pleas, was too clear sighted not to observe that an artificial presumption was being thus built up with no solid foundation. To require what amounted to a necessary implication to exclude the heir, was, he declared in 1741, "carrying it too far;" the true rule being that he was not to be disinherited "unless there be express words or the intent of the devisor be manifest and apparent." *Roe* v. *Wickett*, Willes, 303, 309; *Moone* v. *Heaseman*, ibid. 138, 141. See *Trent* v. *Hanning*, 7 East, *97, *103, 1 B. & P. N. R. 116, 118. Lord Hardwicke, a few years later, stated the same view, saying that an implication was called necessary in the sense intended by Chief Justice Vaughan, not as being the only possible conclusion, but "because the court finds it so to answer the intention of the devisor." *Coryton* v. *Helyar*, 2 Cox Ch. 339, 348. Lord Mansfield, in 1773, defined it in the same way. The term "necessary implication," he said, was used simply "in opposition to conjecture. Conjecture

is, when you suppose what would have been the testator's meaning if he had had the whole case before him; and what, if he had thought of such an event, he would have said upon it." *Jones* v. *Morgan,* 1 Fearne on Rem., App. III, 577, 589. The rule, as stated by Jarman, took its final form, however, from a remark of Lord Eldon, in 1813, that "necessary implication means, not natural necessity, but so strong a probability of intention, that an intention contrary to that, which is imputed to the testator, cannot be supposed." *Wilkinson* v. *Adam,* 1 V. & B. 422, 459, 466.

If this be true, the presumption in favor of the heir is put on substantially the same ground as that in favor of the innocence of one on trial for crime. Such a rule, if it ever merited a place in English law, is inapplicable to the conditions of political society in a country where primogeniture and a landed aristocracy supported by the perpetuation of family estates through settlements and entailments are unknown.

In England, inheritance is by feudal tradition and customary law, and so may stand more on the footing of a natural or divine right. *Solus Deus haeredem facere potest, non homo.* 1 Coke on Litt. 7, b.. In this country it is purely statutory, and our system of equality of distribution is in derogation of the common law.

That in a contest between one claiming by devise and another claiming by descent, or between an heir and a remoter relative or stranger, each claiming to be the person intended under a testamentary provision, the heir, if the construction of the will is so doubtful that it might be interpreted in favor of him as well as of the other, should be preferred, is undoubtedly true. *Pendleton* v. *Larrabee,* 62 Conn. 393, 396; *Hughes* v. *Knowlton,* 37 id. 429, 432. Beyond this we have never gone. In one case, indeed, allusion was made to the proposition now contended for by the heir at law, as being, subject to a certain limitation, a principle of law; but the decision was based upon the established rule that courts will endeavor to avoid a construction which would result in partial intestacy; a rule, which it was observed, leads in quite a

different direction from that stated by Jarman which is now in question. *Peckham* v. *Lego*, 57 Conn. 553, 559.

If Ann Morris and Nathaniel H. Weed, named as legatees in the will before us, had not survived the testator, there can be no doubt that the moneys left for their benefit would have fallen under the operation of the residuary clause. Its interpretation must be the same under the circumstances which in fact exist. The meaning of words is not changed because, after they were written, a certain event has or has not happened. Here the testator uses words sufficient, unless artificially restricted, to carry his entire residuary estate. It may be, as has been suggested at the bar, that he had forgotten for the moment that he had made no particular disposition of the principal of the two trust funds. If so, his lapse of memory could only be important if the inquiry were one as to his testamentary capacity. So far as concerns the construction of a will, the question always is, not what the testator meant to say, but what is meant by what he did say.

The value of the testator's estate, at the date of his will, was about $95,000. His pecuniary legacies amounted in all to $66,500, in addition to the Morris and Weed trust funds, for which the executors have set apart $28,000. The claims against the estate amounted to nearly $500. He might, therefore, have well apprehended that there would not be enough to satisfy all his bequests. It is quite probable that it was with this solely in view that he made the provision for a proportional abatement of a certain class of them, with the accompanying clause as to a proportionate increase in case of an overplus. This probability is strengthened by his reference to this abatement as to take effect " if it shall appear after my decease that there cannot be realized a sufficient amount." Apparently he had in mind what might be the result of a turning of his property into money shortly after his decease. But it does not appear from the will that, had the existence of these two trust funds been called to his attention, he would not have made precisely the same provision. This being so, the terms which he employed must control; and to confine

them to any "particular residue" would be to do violence to their primary and natural signification.

Words are, at times, but an imperfect vehicle of thought, even when used in oral speech and explained by all that look, tone and gesture can supply. Still more, in the case of the dead, when what they intended to express is to be gathered from a written document, must this meaning be often a matter of probability, rather than of certainty. The probability, indeed, on which is rested a devise or bequest by implication must be apparent, and not a mere matter of conjecture; but it need not, even as against the heir, be necessarily such that from the words employed an intention to the contrary cannot be supposed.

The amount to be placed at interest for the benefit of Ann Morris was to be "sufficient to provide an annual interest or income of six hundred (600) dollars." It was therefore not to be more than was reasonably sufficient for that purpose. All parties agree that so far as can be foreseen at the present time, a capital of $15,000 is reasonably sufficient. In fact, $18,000 was set apart; the expressed object being to provide this income " and such additional income as may be necessary for her support." The addition of $3,000 to raise this additional income was improper. Ann Morris was 78 years old at the date of the will. In view of her expectation of life, the provision for the contingency of her "unusual or pro-. longed disability or illness " must be taken to refer to an application of part of the principal of the fund, or of any possible accumulations of income. Whatever that income might be, she could claim no more, under usual conditions, than $600 a year. The balance would remain attached to the fund during her life.

Her funeral expenses were, in like manner, made a charge on the principal and any accumulations of income. Their payment would not be called for until the termination of her annuity, and not being an annual charge, there would be no propriety in setting apart any additional capital to raise an income to defray them.

The Greenwood Cemetery Association is neither a religious

nor a benevolent society or institution, and the legacy in its favor was made as a trust for a particular purpose, not public or charitable in its nature. *Coit* v. *Comstock*, 51 Conn. 352, 386 ; General Statutes, § 1874. Had there been a deficiency of assets, this legacy would not have been among those subject to abatement; nor can the association now share in the surplus.

Neither the executors as trustees of the Morris or the Weed trust fund, nor Ann Morris, nor Nathaniel H. Weed, can be reckoned among the residuary legatees.

Each of these funds was to be set apart to raise an annuity of a specified sum. It was to be large enough to raise it, and there could be no object for increasing it out of the residue, so long as the annuity remained the same. Nor is the language of the thirty-seventh clause apt for increasing either annuity. They were not to be payable out of the general estate, but only from such income as might, after the testator's decease, be realized from capital sums especially appropriated for the purpose.

The fund of $5,000 to be placed at interest by the executors for the support of Annie Inglis and her children, and to be divided among them when or before her youngest child comes of age, is entitled to share in the residue. The entire interest on that fund is to go to the beneficiaries named, thus making it plainly for their advantage to increase the capital.

The Superior Court is advised that no part of the estate is intestate; that the addition to the capital of the trust fund created for the benefit of Ann Morris for the purpose of raising an income for her support in excess of $600 a year was unauthorized by the will; that any income from said trust fund remaining in any year after paying her annuity should be added to the capital; that her funeral expenses and those of Nathaniel H. Weed are chargeable to the capital, and to any accumulations of income thereon, of their respective trust funds ; that if, in any year of the life of Ann Morris, by reason of her unusual or prolonged disability or illness, $600 should not be sufficient for her support, the executors may add to said annuity such a reasonable amount from the capi-

tal of her trust fund or any accumulations of income thereon as may seem to them to be necessary; that the trust fund created for the benefit of Nathaniel H. Weed, with its accumulations, less his funeral expenses, is a part of the residue of the testator's estate, and is disposed of by the thirty-seventh clause of the will, and may properly be now distributed under the same; that the trust fund created for the benefit of Ann Morris, with any accumulations of income that have accrued or may accrue, is part of said residue, and upon her decease the same, or what may remain thereof after any additions to her income that may have been properly made therefrom, less her funeral expenses, should be distributed under said clause; that neither the Greenwood Cemetery Association, nor Ann Morris, nor Nathaniel H. Weed, nor the executors as trustees for either, are entitled to share in said residue, but that all other legatees of sums of moneys, including the executors as trustees for any such legatees, do share in the same; and that the New York Society for the Relief of the Ruptured and Crippled in the City of New York is the legatee intended by the testator by the description of the "Institution for the Relief of the Ruptured and Crippled in the City of New York."

No costs will be taxed in this court in favor of any party.

In this opinion the other judges concurred.