FREDERICK S. WARD ET AL., EXECUTORS, *vs.* HENRY IVES ET ALS.

FREDERICK S. WARD, TRUSTEE, ET ALS. *vs.* HENRY IVES ET ALS.

Third Judicial District, New Haven, June Term, 1916.

PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

Ancestral real estate of an intestate, as defined by our statute, § 398, is such as came to him by descent, gift, or devise from any kinsman.

Title by descent is one which is cast upon the recipient by operation of law.

A distribution of intestate realty does not create a title in the distributees, nor does it operate to change a title by descent into one by purchase. It simply recognizes the pre-existing right or title of the distributees, and divides in severalty what the parties in interest had already acquired in cotenancy.

Upon the death of its owner intestate, the title to his realty vests at once and by operation of law in his children, if any, as cotenants, subject to the widow's right of dower; and the title thus vested can be divested only by a conveyance by the cotenant, or by a partition, through a distribution or otherwise, which assigns to the cotenant ownership in severalty in other property similarly held by such cotenants.

The postponement of a distribution does not alter the course of descent, nor is the form which the distribution takes of any importance in determining either the source of the title or the nature or quality of it as one by descent or otherwise; for the law looks behind the

form of the procedure to discover the real significance and legal import of that which was done in connection with the situation as it was.

Acquiescence in a distribution which erroneously subjects the land allotted to one of the distributees to a life estate in a third person, may, in conjunction with other circumstances, estop the distributee and those claiming under him, from disputing the validity of the claimed life estate, but such estoppel has no other or further effect. It does not furnish an independent source of title, nor change in any respect the nature of the title of the distributee, which in the present case was one by inheritance or descent.

A building or other structure which is voluntarily, and without contract, erected by one person upon land of another, is thereby annexed to the soil and forms part of the realty, the title to which absorbs and includes the title to such building or structure.

Section 4052 of the General Statutes, which authorizes an allowance to be made to the defendant in an action of ejectment for the value of improvements which he has in good faith made upon the property in the belief that his title to the land was absolute, does not apply to a situation in which—as in the present instance—all the money expended in improving the property was that of the rightful owner of the land and no mistake existed as to the ownership of the premises.

The case of *Ward* v. *Ives*, 75 Conn. 598, explained.

Argued June 13th—decided July 27th, 1916.

APPEALS by the respective plaintiffs from a decree of the Court of Probate for the district of New Haven ordering certain real estate, formerly belonging to Mabel Ives Stevens of New Haven, deceased, to be distributed as ancestral estate to the defendants, taken to and tried together by the Superior Court in New Haven County, *Case, J.;* facts found and judgment rendered for the defendants in each case, from which the plaintiffs appealed. *No error.*

Henry Ives died intestate in 1859, leaving a widow, Eliza, and three children, Frederick, Wilbur, and Ellen M., the latter married to Samuel A. Stevens, and a considerable estate which included several pieces of realty in New Haven. In the course of the settlement of his estate, a partial distribution was made in 1860.

By this distribution there was assigned to the widow for her dower two undivided fifths of a house and lot on Wall Street at the corner of Orange Street, together with other property. The remaining three fifths were distributed to the daughter, Mrs. Stevens, and the son Wilbur, two undivided fifths to the former and one undivided fifth to the latter. The two fifths assigned to the widow were not further distributed, and remained so undistributed until the widow's death in 1886. Meanwhile Wilbur had conveyed his interest in the property to Mrs. Stevens in 1864. He died in 1871 without issue and having never married.

Mrs. Stevens died intestate in 1881, leaving her husband, and her daughter Mabel, who was her sole heir at law. Her estate was duly administered by her husband. Mabel, who was born November 25th, 1873, died July 24th, 1898, intestate, without issue, and having never married. Her father, Samuel A. Stevens, survived her, and lived until November 12th, 1912.

In 1883 Frederick died leaving three children, all now living, and no representative of a deceased child.

In 1886 Eliza, the widow of Henry Ives, having died, so much of his estate as had by the partial distribution of 1860 been assigned to her as dower, was distributed under an order of court, one half to Mabel and the other half to the representatives of Frederick. In this distribution the two undivided fifths of the Wall Street property was set out to Mabel subject, as the report of the distributors stated, "to the life interest therein of Samuel A. Stevens, husband of Ellen M. Stevens, as tenant by the curtesy."

After Henry Ives' death, Eliza, his widow, continued to live in the house then standing upon the Wall Street property until her death, residing there with her daughter, Mrs. Stevens, until her death and then with Mr.

Stevens and Mabel. After Eliza's death Mr. Stevens and Mabel remained in occupation of the house until the latter's death, and following that event the former continued to live there until his death.

The dwelling-house stood upon that portion of the lot which was adjacent to Orange Street. The remaining land, lying to the west and fronting on Wall Street, was the yard and garden attached to the house until after Eliza's death. Shortly thereafter, and subsequent to the distribution of the two undivided fifths to Mabel in 1886, Mr. Stevens, as her guardian and without objection from her, erected a brick block, consisting of three houses, upon this part of the land. The present value of the block is about $19,000, and of the land upon which it stands, having a frontage of 76.2 feet on Wall Street and a depth of 100 feet, some $14,000 or $15,000.

In the administration of Mabel's estate a controversy arose between Samuel A. Stevens, claiming as tenant by the curtesy, and the children of Frederick Ives, deceased, claiming as ancestral heirs of Mabel, concerning the rentals of the Wall Street property, and on appeal from certain orders of the Court of Probate this controversy was carried to the Superior Court and to this court as reported in *Ward* v. *Ives*, 75 Conn. 598, 54 Atl. 730.

Until her death Mabel remained the owner of the entire property, including the original dwelling-house and the land upon which it stands and the block and the land it occupies, subject only to such right of curtesy as her father had therein, and this property has been inventoried and administered as a part of her estate.

*Lewis Sperry* and *Seymour C. Loomis*, for the appellants (plaintiffs).

*Leonard M. Daggett* and *Frederick H. Wiggin*, for the appellees (defendants).

PRENTICE, C. J.   Mabel Ives Stevens died in 1898 owning, subject to a life estate in her father, Samuel A. Stevens, who survived her, certain real estate located on Wall Street in New Haven, upon which a dwelling-house and brick block were and are now standing.   Her sole heir was her father, who died in November, 1912. In the process of the settlement of her estate this real estate was—under an order of the Court of Probate of New Haven adjudging that it was ancestral estate derived by her by descent from her mother, Ellen M. Stevens, deceased, and ascertaining the distributees— set out as such estate to the three children of Frederick Ives, cousins of the deceased on the mother's side.   The executors of the will of Samuel A. Stevens and the devisees thereunder have appealed from this order of the Court of Probate under which this distribution was made, and filed reasons of appeal which, in so far as they are now pressed, have their foundation in two claims overruled by the Superior Court, which affirmed the order appealed from: (1) that an undivided two fifths of the property is not ancestral estate and was wrongfully ordered distributed as such; and (2) that the brick block, having been erected subsequent to Ellen M. Stevens' death, was not to be regarded as ancestral estate derived by Mabel by descent from her mother, and was improperly ordered distributed as such.

Ancestral real estate is defined by our statute of distributions as "real estate of the intestate which came to him by descent, gift, or devise from any kinsman."   General Statutes, § 398; Id.   (1888) § 632. Mabel received no interest in the Wall Street property by gift or devise.   Title which comes by descent is title which is cast upon the recipient by opera-

tion of law. The intervention of a distribution, as a part of the proceedings had in the Court of Probate for the orderly settlement of an estate, does not operate to change a title by descent into one by purchase. Such distribution is not an original source of title. It simply declares what the law has ordained, and, if occasion requires, divides in severalty what the parties in interest have already acquired in cotenancy. *Gerard* v. *Ives*, 78 Conn. 485, 489, 62 Atl. 607.

The two undivided fifths, which it is contended was not ancestral estate in Mabel, are the two fifths which were distributed to her in the distribution made in 1886 of that portion of the estate of Henry Ives, Mabel's maternal grandfather, which had previously been assigned to his widow as dower. No question is raised as to the distribution of the remaining three fifths in so far as this branch of the case is concerned. With respect to the two fifths in question, two salient points are to be noticed: (1) that whatever right, title or interest Mabel had at her decease, or for that matter ever had, in or to the Wall Street property, came to her by reason of her being the sole heir of her mother; (2) that the two fifths in question represent her mother's vested interest in that portion of the estate of Henry Ives which, by the distribution of 1860, was assigned to his widow as dower.

The soundness of the first of these propositions is apparent. That the second is also sound is equally certain. When Mr. Ives died the title to his real estate, immediately and by operation of law, became vested in his three children subject to the widow's right of dower. *Candee* v. *Candee*, 87 Conn. 85, 87, 86 Atl. 758; *Ward* v. *Ives*, 75 Conn. 598, 601, 54 Atl. 730. When the partial distribution of 1860 was made that condition remained unchanged in so far as the two undivided fifths in the Wall Street property, assigned as dower, were con-

cerned, save as affected by such assignment. The three children were its owners as tenants in common, subject to the dower interest in their mother. When, in 1871, Wilbur died unmarried and without issue, whatever right, title or interest he had in or to the property, beyond that already conveyed by him to Mrs. Stevens, passed at once to her and to Frederick, who thereupon became owners as tenants in common of the two fifths, subject to the dower interest. The title, which thus became vested in Mrs. Stevens as one of two tenants in common, could not have been divested save by her conveyance or a partition through a distribution or otherwise which should assign to her an ownership in severalty in other property similarly owned by the cotenants. No conveyance was made by her, and no distribution or other partition in severalty was had during her lifetime, so that she died, in 1881, with the title as tenant in common with her brother still in her. By her death that title passed immediately to Mabel as her sole heir.

Then followed the death of Frederick in 1883, with the consequent devolution of his title upon his legal representatives, and later still the distribution of 1886. The postponement of this distribution, which might have been made immediately upon the assignment of dower, did not alter the course of descent. It related back to the death of Henry Ives, and simply turned an estate in cotenancy into estates in severalty. *Ward* v. *Ives,* 75 Conn. 598, 601, 54 Atl. 730. Such being the nature of a distribution, the partition should have been made between the estates of Mrs. Stevens, Frederick and Wilbur, a portion in severalty being assigned to each estate, thus leaving such portions so distributed to be redistributed in turn in due course of descent until Mabel and the legal representatives of Frederick were reached. *Ward* v. *Ives,* 75 Conn. 598, 601, 54

Atl. 730. The course pursued, although irregular, accomplished the same practical result by its short-cut process that proceedings in due course would have accomplished. The error lay in aparting the property among the cotenants as of the time of the distribution and not as of the time of Mr. Ives' death. It did not lead to improper results, however, since the distribution was made to and among those to whom the property then belonged by the devolution of title by operation of law. The form which the distribution took can have no significance in the determination of either the source of title or the quality of it as one by descent or otherwise. The law will look behind the form of the procedure adopted, to discover the real character and legal significance of that which was done when taken in connection with the situation as it was.

The appellants are thus driven, in support of their contention that the Wall Street property was not ancestral estate in Mabel by virtue of its having come to her by descent, to find some source of title other than the law or a distribution pure and simple, which is but an utterance of the voice of the law.

In this connection it is to be noted that a construction of the distribution of 1886, which would regard it as passing directly to Mabel the property distributed to her therein would not avail the appellants. Under such a construction the property would still be ancestral estate. The only difference which would result would be in the person of the kinsman from whom it came to her, and that difference would be in the present case one of no practical importance.

The appellants claim to have found the desired source of title in the distribution of 1886 taken in connection with the circumstances which are gathered around it, all of which, as it is said, go to make up an independent source of title. In support of their con-

tention they point to the opinion of this court in *Ward* v. *Ives*, 75 Conn. 598, 54 Atl. 730, and urge that it was there held that the distributees under it took title, as stated in the brief of counsel, "by decree of the Court of Probate and by estoppel, under a family agreement."

That case involved this same Wall Street property and distribution. The question at issue was the right of Mabel's father after her death to the rents and profits of the property as life tenant. The distribution of 1886 had set out the two fifths to her subject to the life interest of her father as tenant by the curtesy. He was not, under the law, such tenant. We held that by reason of the circumstances the distribution was to be regarded as the product of a family arrangement between the parties concerned which had been so long adopted, taken advantage of, acquiesced in, and lived under, that the parties would not be permitted to dispute Mr. Stevens' right to the life use therein recognized. Nowhere in the opinion is it intimated that the distribution was effective to give Mr. Stevens a life estate. In fact it is careful to guard against such a suggestion, and the decision is distinctly based upon an estoppel created by the conduct of the parties. *Evarts* v. *Johnson*, 88 Conn. 683, 688, 92 Atl. 434. That estoppel was relied upon as furnishing support to a provision in the distribution recognizing a right in Mr. Stevens which was neither lawfully his, nor had been set out to him. The court was not considering an award in distribution to him. There was none. It was considering a mere recognition of a right in its relation to and connection with other recognitions and conduct. The property which the distribution set out to the several distributees, including Mabel, was all of it property which was theirs as of right, and which was simply aparted between them in severalty. It requires no estoppel to support their right to hold what was set

to them. They took by a higher right, to wit, the right of descent. That they might now succeed in defending their titles upon the lower ground of estoppel is of no consequence in determining their true source. *Weed* v. *Scofield*, 73 Conn. 670, 674, 49 Atl. 22.

In this connection it is significant to observe that the parties who in *Ward* v. *Ives*, 75 Conn. 598, 54 Atl. 730, were challenging Mr. Stevens' right to the rents and profits were the present defendants and distributees who, if the appellants' claim is well founded, had no interest whatsoever in the property, and that the right of Mr. Stevens so challenged and which he was solicitous to defend, was that of a life tenant, when, if the appellants' present contention is correct, he had full title to the property as the sole heir of his daughter. Mr. Stevens appears to have asserted no claim that he was the owner of the property or had a greater right than that of life tenant, and the court certainly did not look upon him as such owner. The facts were all before us, and yet we took into serious consideration a question which was entirely idle and presented by parties who were without interest, if the appellants are now right in their claim. It is safe to assume that those features of the situation which, it is now urged, lead to such a result, were not overlooked or ignored.

The appellants' second claim, that in no event should the brick block, erected subsequent to Mrs. Stevens' death, be distributed as ancestral estate, encounters the obstacle interposed by the familiar rule of the common law that a building or other structure voluntarily and without contract erected by one person upon land of another, becomes thereby annexed to the soil and a part of the realty. *Husted's Appeal*, 34 Conn. 488, 495; *Washburn* v. *Sproat*, 16 Mass. 449. The title to such building or structure merges into the title to the realty so that it is lost in the merger. The land and the build-

ings not only become one legal entity, but they are also inseparable as respects the character of their ownership and all its incidents. In the fullest sense they are one in the eye of the law.

We have a statute (General Statutes, § 4052) affording relief under certain conditions where improvements have been made upon land by one not the true owner, and it has been held that the courts, in the exercise of their equitable jurisdiction, have power to grant relief under similar conditions. *Beach* v. *Osborne*, 74 Conn. 405, 410, 50 Atl. 1019, 1118. Those conditions, or any akin to them, are not present in this case. All the money expended in the improvement of this property by the building of the block was that of the rightful owner of the land, and there was no mistake as to that ownership; nor are there other circumstances involved which should appeal to the conscience of a chancellor to lead him to intervene that injustice may not be done by the application of the rules of law.

The appellants, by the distribution of the Wall Street property, including the block, as ancestral estate, would be deprived of nothing to which they have or ever had any legal, equitable or moral right. It, and all that went into it, was Mabel's. She was under no duty to preserve it for prospective heirs or devisees, or to preserve its character so that certain heirs or devisees might ultimately get it. The block was built by her father, under whom the appellants claim, acting as her guardian and using her money. His action was in legal effect hers. It was also his, and voluntary. Presumably he knew the law making such erection an annexation to the realty. His subsequent action, covering many years, was consistent with such knowledge and acquiescence in its natural consequences. Even when his right to the rents and profits was challenged in the case of *Ward* v. *Ives*, 75 Conn. 598, 54

Atl. 730, he did not assert that, as to the block, there had been no such merger of title as to deprive him of his right of inheritance as the heir of his daughter. In this situation justification for equitable interference on behalf of his executors and in the interest of his devisees clearly is not shown. The devisees stand in even a worse position. Their interest is one which came into being upon Mr. Stevens' death, and it is confined to sharing the estate of which he died possessed in such manner as he ordained by his will. It is not an interest which reaches back of that time, and entitles them to be heard as to the management or use of Mabel's property while she lived, to the end that her father surviving her might inherit from her, and they thus be enabled to benefit through the increase of his estate.

The appellants point to §§ 1038 and 1039 of the General Statutes as in some way, not clearly indicated, helping out their claim. It is sufficient to say of these provisions that Mabel's death antedates their enactment, and that the conditions therein specified are not present in the situation before us.

There is no error in either case.

In this opinion the other judges concurred.