RICHARD E. MAHONEY, SR., ADMINISTRATOR (ESTATE OF RICHARD E. MAHONEY, JR.), ET AL. *v.* BRIAN LENSINK, COMMISSIONER OF MENTAL RETARDATION, ET AL.
(13605)

Peters, C. J., Shea, Glass, Covello and Hull, Js.

Argued October 31, 1989—decision released January 30, 1990

*Paul J. Lahey,* assistant attorney general, with whom were *Richard J. Lynch,* assistant attorney general, and,

on the brief, *Clarine Nardi Riddle,* attorney general, *Carl J. Schuman,* former assistant attorney general, and *Andrea Gaines,* assistant attorney general, for the appellants-appellees (defendants).

*William B. Wynne,* for the appellees-appellants (plaintiffs).

*Lawrence W. Berliner* filed a brief for the Office of Protection and Advocacy for Handicapped and Developmentally Disabled Persons as amicus curiae.

PETERS, C. J. This appeal concerns the availability and the scope of the remedy afforded by General Statutes § 17-206k to a voluntary patient in a state mental hospital who claims a deprivation of personal, property and civil rights under General Statutes § 17-206b and a violation of his right to humane and dignified treatment under General Statutes § 17-206c.[1] The plaintiffs, Richard E. Mahoney, individually and in his capacity as administrator of his son's estate,[2] and Barbara

---

[1] General Statutes § 17-206k provides: "Any person aggrieved by a violation of sections 17-206a to 17-206j, inclusive, may petition the superior court within whose jurisdiction the person is or resides for appropriate relief, including temporary and permanent injunctions, or may bring a civil action for damages."

General Statutes § 17-206b provides: "No patient hospitalized or treated in any public or private facility for the treatment of the mentally disordered shall be deprived of any personal, property or civil rights, including the right to vote, hold or convey property, and contract, except in accordance with due process of law, and unless he has been declared incompetent pursuant to chapter 779. Any finding of incompetency shall specifically state which civil or personal rights the patient is incompetent to exercise."

General Statutes § 17-206c provides in pertinent part: "Every patient treated in any facility for treatment of the mentally disordered shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy. Each patient shall be treated in accordance with a specialized treatment plan suited to his disorder."

[2] The decedent's statutory right of action under General Statutes § 17-206k survives his death by virtue of General Statutes § 52-599 (a), which provides in pertinent part: "A cause or right of action shall not be lost or destroyed by the death of any person, but shall survive in favor of or against the executor or administrator of the deceased person." Thus, the decedent's administrator is a proper party to bring an action pursuant to § 17-206k.

Mahoney, individually, brought an action against the commissioners of mental health, state police and mental retardation[3] upon the death of their son while a patient at Norwich Hospital.[4] The trial court dismissed this action for lack of subject matter jurisdiction. On appeal, the Appellate Court set aside the judgment of dismissal insofar as the plaintiffs had alleged a violation of § 17-206c but upheld the dismissal with respect to the alleged violation of § 17-206b[5] and remanded the case for further proceedings. *Mahoney* v. *Lensink,* 17 Conn. App. 130, 550 A.2d 1088 (1988). We granted both the defendants' petition for certification; *Mahoney* v. *Lensink,* 210 Conn. 806, 554 A.2d 742 (1989); and the plaintiffs' cross petition for certification.[6] *Mahoney* v. *Lensink,* 210 Conn. 806, 554 A.2d 743 (1989). We affirm the Appellate Court's construction of § 17-206k as a waiver of the state's sovereign immunity, but conclude that the administrative and public history of the patients' bill of rights; General Statutes §§ 17-206a

---

[3] Alleging that the commissioner of state police is responsible for certain security personnel at Norwich Hospital, the plaintiffs have included him as a defendant in the complaint. With respect to the named defendant, Brian Lensink, commissioner of mental retardation, the plaintiffs have withdrawn their appeal. *Mahoney* v. *Lensink,* 17 Conn. App. 130, 131–32 n.1, 550 A.2d 1088 (1988).

[4] Norwich Hospital comprises one of the public mental health facilities operated by the state department of mental health. See General Statutes § 17-207b (b).

[5] The Appellate Court also upheld the judgment of dismissal as to the counts in the plaintiffs' complaint brought in their individual capacities that sought funeral expenses and loss of consortium. *Mahoney* v. *Lensink,* 17 Conn. App. 130, 141–42, 550 A.2d 1088 (1988). Because the plaintiffs have not challenged the Appellate Court's ruling on these counts, that judgment is final.

[6] We certified the following questions in the appeal: (1) Did the enactment of General Statutes § 17-206k waive the sovereign immunity of the state with respect to violations of General Statutes §§ 17-206b and 17-206c? (2) Did the allegations of the plaintiffs' complaint sufficiently allege a violation of General Statutes §§ 17-206b and 17-206c? The questions certified in the cross appeal were identical.

through 17-206k; compels a broader construction of the statutory causes of action thereby created. Accordingly, we now reverse in part.

The Appellate Court's opinion reveals the following factual and procedural history derived from the allegations in the plaintiffs' complaint. The plaintiffs' son, Richard Mahoney, Jr., "was killed when he jumped from an oil tank reserve located on the grounds of [Norwich] hospital." *Mahoney* v. *Lensink,* supra, 17 Conn. App. 132. The decedent was a "voluntary admission patient" at Norwich Hospital; id.; alleged to be suffering "from a mental illness that included suicidal tendencies." Id., 138. The plaintiffs alleged that the defendants' failure "to provide proper counseling, medication, supervision or suicide precautions, so as to prevent the decedent from acting on his suicidal tendencies"; id., 138–39; amounted to "negligent, wanton, and willful misconduct" which caused the death of their son. Id., 132. Count ten of the amended complaint, to which this appeal is limited,[7] claims that this alleged misconduct violated both §§ 17-206b and 17-206c, but it fails to specify what factual allegations are applicable to either statute. Id., 137–38.

Asserting that the doctrine of sovereign immunity barred the plaintiffs from bringing this action against the state or its commissioners, the defendants moved to dismiss the complaint in its entirety on the ground that the trial court lacked subject matter jurisdiction. Id., 132. Because any statutory waiver of sovereign immunity must be narrowly construed, the defendants

[7] The amended complaint, to which the defendants addressed their motion to dismiss, contained twelve counts. The plaintiffs brought counts one through ten on behalf of the estate of their son and counts eleven and twelve on their own behalf. Because the plaintiffs failed to challenge the trial court's judgment of dismissal as to counts one through nine, that judgment is final. With regard to the disposition of the individual counts for funeral expenses and loss of consortium, see footnote 5, supra.

argued that § 17-206k's provision for "[a]ny person aggrieved" to "bring a civil action for damages" does not constitute the type of express authorization that signals legislative abrogation of sovereign immunity. Persuaded by this argument, the trial court concluded that "§ 17-206k does not constitute legislative consent to a suit for damages against the state or its commissioners," and granted the motion to dismiss. Id., 133.

In the plaintiffs' appeal to the Appellate Court, the defendants did not contest the proposition that patients in state mental health facilities are entitled to the substantive rights afforded by §§ 17-206b and 17-206c. The defendants argued, however, that whatever remedial rights might be afforded to patients in private mental hospitals, patients in state hospitals could pursue their statutory remedies only through recourse to the claims commissioner.[8] Id., 135. The Appellate Court rejected this distinction. Having determined that patients in state mental health facilities are included among the class of individuals potentially aggrieved by violations of §§ 17-206b and 17-206c, the Appellate Court construed § 17-206k in light of the rights for which it provides remedies. Id., 135–36. Because § 17-206k does not distinguish between remedies available to state facility patients and private facility patients, the Appellate Court concluded that the legislature intended § 17-206k to authorize direct civil actions against the state or its commissioners by patients of state mental health facilities aggrieved by violations of §§ 17-206b and 17-206c. Id., 136.

---

[8] General Statutes § 4-142 provides in pertinent part: "There shall be a claims commissioner who shall hear and determine all claims against the state except . . . (2) claims upon which suit otherwise is authorized by law . . . ." General Statutes § 4-160 (a) provides in pertinent part: "When the claims commissioner deems it just and equitable, he may authorize suit against the state on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable."

The Appellate Court went on to hold, however, that the plaintiffs' complaint failed to allege a cause of action under § 17-206b. Id., 138. The Appellate Court opined that § 17-206b guarantees only that hospitalization or treatment in a mental health facility cannot be used as justification for depriving a patient of a right that a patient otherwise enjoys. Id., 137–38. Because the claimed rights to proper counseling, medication, and suicide precautions are not rights held absent hospitalization, but instead arise, if at all, as a result of hospitalization, the Appellate Court found no error in the judgment of dismissal with respect to the alleged violations of § 17-206b. Id., 138.

The Appellate Court came to a different conclusion with respect to the plaintiffs' allegations pursuant to § 17-206c. Id., 140–41. Unpersuaded by the defendants' assertion that the guarantee of humane and dignified treatment contemplates only the protection of personal dignity and privacy, such as the right to refuse medication; id., 138; the Appellate Court held that § 17-206c accords a patient a positive right to treatment. Id. The Appellate Court also rejected the defendants' contention that, because a merely negligent failure to afford proper treatment does not constitute a cause of action under 42 U.S.C. § 1983, § 17-206c similarly requires allegations rising above negligence. Id., 139–40. Noting that the federal due process clause is the source for the right to treatment recognized by the federal courts; id.; the Appellate Court reasoned that a right to humane and dignified treatment conferred by statute; General Statutes § 17-206c; does not necessarily embody federal constraints on an actionable right to treatment. Id., 140. The Appellate Court thus concluded that "[s]ection 17-206c creates a new tort liability based upon a specified course of conduct that is not dependent upon common law negligence." Id.

The present appeal requires us to resolve three issues. On the defendants' appeal, we must decide whether the Appellate Court erred in construing § 17-206k as an abrogation of the state's sovereign immunity, and in construing § 17-206c to encompass the allegations in the plaintiffs' complaint. On the plaintiffs' cross appeal, we must determine whether their complaint properly invokes the rights conferred upon the decedent by § 17-206b. We affirm the Appellate Court's ruling on the appeal, and reverse its ruling on the cross appeal.

I

We turn first to the jurisdictional issue, whether § 17-206k, in providing a statutory remedy for those persons aggrieved by violations of any specific provisions of the patients' bill of rights, §§ 17-206a through 17-206k, constitutes an abrogation of sovereign immunity so as to authorize a voluntary patient in a state mental facility to sue the state or its commissioners.[9] "It is settled law in Connecticut that the state is immune from suit unless, by appropriate legislation, it authorizes or consents to suit." *Owner-Operators Independent Drivers Assn. of America* v. *State,* 209 Conn. 679, 684, 553 A.2d 1104 (1989). A legislative decision to waive sovereign immunity must be manifested either " ' "by the use of express terms or by force of a necessary implication." ' " *Struckman* v. *Burns,* 205 Conn. 542, 558, 534 A.2d 888 (1987), quoting *Murphy* v. *Ives,* 151 Conn. 259, 262–63, 196 A.2d 596 (1963). Moreover, because such statutes are in derogation of the common law, " '[a]ny statutory waiver of immunity must be narrowly construed'; *Struckman* v. *Burns,* supra; and its scope must be confined strictly to the

---

[9] Because the state acts through its officers and agents, a suit against an officer concerning a matter in which the officer represents the state is, in effect, a suit against the state. *University of Connecticut Chapter, AAUP* v. *Governor,* 200 Conn. 386, 388, 512 A.2d 152 (1986); *Horton* v. *Meskill,* 172 Conn. 615, 623, 376 A.2d 359 (1977).

extent the statute provides. *Berger, Lehman Associates, Inc.* v. *State,* 178 Conn. 352, 356, 422 A.2d 268 (1979) . . . ." *Owner-Operators Independent Drivers Assn. of America* v. *State,* supra, 685.

In reliance on these accepted principles, the defendants assert that the Appellate Court erred in construing § 17-206k to abrogate the state's sovereign immunity. The defendants maintain that the use of such generalized language as "any person aggrieved" in § 17-206k evinces neither an express intention nor the force of implication necessary to constitute a statutory waiver of sovereign immunity. The defendants further argue that the absence of any meaningful legislative history bolsters their claim that this generalized statute does not abrogate the state's sovereign immunity. We disagree.

On its face, the provision in § 17-206k that "[a]*ny person aggrieved* . . . may bring a civil action for damages" (emphasis added) does not expressly waive sovereign immunity. A statute must be considered, however, as a whole, with a view toward reconciling its separate parts in order to render an overall reasonable interpretation. *Shortt* v. *New Milford Police Department,* 212 Conn. 294, 305, 562 A.2d 7 (1989); *American Universal Ins. Co.* v. *DelGreco,* 205 Conn. 178, 193, 530 A.2d 171 (1987). The determinative question, therefore, is whether a contrary implication necessarily flows from the juxtaposition of this section with the remaining provisions of the patients' bill of rights.

Several provisions of the patients' bill of rights illuminate the breadth of the legislative concern for the fair treatment of mental patients. Because the patients' bill of rights is remedial in nature, its provisions should be liberally construed in favor of the class sought to be benefited. See *Muha* v. *United Oil Co.,* 180 Conn. 720, 728, 433 A.2d 1009 (1980). Notably, § 17-206b

mandates that "[n]o patient[10] . . . treated in any *public* or private *facility* for the treatment of the mentally disordered *shall*[11] be deprived of any personal, property or civil rights . . . ." (Emphasis added.) Similarly, § 17-206c entitles "[e]*very patient*[12] treated in *any facility* [to] receive humane and dignified treatment . . . ."[13] (Emphasis added.) As the Appellate Court properly noted and the defendants concede, patients

[10] General Statutes § 17-206a (b) defines "patient" expansively as "any person being treated in a facility." This definition necessarily includes both the involuntary patient "hospitalized pursuant to an order of a judge of the probate court after an appropriate hearing or a patient hospitalized for emergency diagnosis, observation or treatment upon certification of a qualified physician"; General Statutes § 17-206a (e); as well as the voluntary patient "who applies in writing for and is admitted to a hospital for observation, diagnosis or treatment of a mental disorder." General Statutes § 17-206a (d). To the extent that federal case law limits right to treatment actions brought under 42 U.S.C. § 1983 to involuntarily confined patients; *Wyatt* v. *Aderholt,* 503 F.2d 1305, 1312 (5th Cir. 1974); see *Rouse* v. *Cameron,* 373 F.2d 451, 453 (D.C. Cir. 1966); or those voluntary patients who allege a sufficient degree of helplessness; *Harper* v. *Cserr,* 544 F.2d 1121, 1123 (1st Cir. 1976); but see *Goodman* v. *Parwatikar,* 570 F.2d 801, 804 (8th Cir. 1978); *Seide* v. *Prevost,* 536 F. Sup. 1121, 1136 (S.D.N.Y. 1982); see generally comment, "The Mentally Ill in Connecticut—A Survey," 6 Conn. L. Rev. 303, 309–13 (1973–74); we decline to adopt those federal precedents. "[I]n the construction of our own statute, we exercise plenary authority that is not preempted by federal precedents"; *Shortt* v. *New Milford Police Department,* 212 Conn. 294, 306–307, 562 A.2d 7 (1989); and thereby conclude that General Statutes § 17-206k provides direct redress for voluntary as well as involuntary patients of any mental health facility, public or private.

[11] Because the use of the word "shall" in this context is directed toward a matter of substance, the statutory provision is mandatory. *Hall Manor Owner's Assn.* v. *West Haven,* 212 Conn. 147, 153, 561 A.2d 1373 (1989); *Fidelity Trust Co.* v. *BVD Associates,* 196 Conn. 270, 278, 492 A.2d 180 (1985).

[12] See footnote 10, supra.

[13] General Statutes § 17-206a (a) defines "facility" expansively to mean "any inpatient or outpatient hospital, clinic, or other facility for the diagnosis, observation or treatment of the mentally disordered." Although the defendants contend that the legislature's failure to include "public" in General Statutes § 17-206c as it had expressly delineated in General Statutes § 17-206b indicates that a narrower construction of "facility," limited to those private in nature, is in order, we are unpersuaded. Because the mean-

in state mental health facilities are clearly included among the class of individuals potentially aggrieved by violations of §§ 17-206b and 17-206c. *Mahoney* v. *Lensink,* supra, 136.

Having established that the substantive provisions of the patients' bill of rights encompass state mental health facilities as well as private institutions, we must determine what implications necessarily follow for the remedial scope of § 17-206k. Like the Appellate Court, we view statutory rights that encompass "any public . . . facility" to provide a remedy against the state, wherever and whenever the state or a municipality operates treatment facilities for the mentally disordered. Despite the defendants' contentions to the contrary, we conclude that it is a necessary implication[14] of the purposes sought to be served by the enactment of the patients' bill of rights that the legislature intended to provide a direct cause of action against the state and thus to waive its sovereign immunity. *State* v. *Magnano,* 204 Conn. 259, 274 n.8, 528 A.2d 760 (1987); *Verrastro* v. *Sivertsen,* 188 Conn. 213, 221, 448 A.2d 1344 (1982). Other state courts have similarly construed analogous statutes to permit an action for damages against the state for mistreatment of a patient within a state mental health facility. *State* v. *Brosseau,* 124 N.H. 184, 191, 470 A.2d 869 (1983); *Chasse* v. *Banas,* 119 N.H. 93, 97, 399 A.2d 608 (1979); see *Scott* v. *Plante,* 691 F.2d 634, 638 (3d Cir. 1982); *State* v.

ing is dependent upon the context and subject matter of the statute, it is apparent here that "any" means "all" or "every." See *King* v. *Board of Education,* 203 Conn. 324, 334, 524 A.2d 1131 (1987). The use of the phrase "any facility" thus necessarily includes those public in nature as well as their private counterparts.

[14] We have construed "necessary implication" in the context of the construction of a testator's intent in a will to mean "[t]he probability . . . must be apparent, and not a mere matter of conjecture; but . . . necessarily such that from the words employed an intention to the contrary cannot be supposed." *Weed* v. *Scofield,* 73 Conn. 670, 678, 49 A. 22 (1901).

*Carter,* 64 N.J. 382, 391–92, 316 A.2d 449 (1974); *E. H.* v. *Matin,* 284 S.E.2d 232, 237 (W. Va. 1981); but see *Woodbridge* v. *Worcester State Hospital,* 384 Mass. 38, 43, 423 N.E.2d 782 (1981); *Caronia* v. *Greenfeder,* 30 Pa. Commw. 337, 374 A.2d 741, 742–43 (1977).

Our conclusion finds support, furthermore, in the history attending the enactment of the patients' bill of rights.[15] Examination of the committee hearings on the senate bill that was eventually codified as § 17-206a et seq. reveals that the act was intended to remedy the then prevailing conditions at state mental health facilities. The principal testimony was that of Walter Voight, who had been employed for four and one-half years at two of the state's mental health hospitals.[16] First observing that "my employment experience in Connecticut's Mental Hospitals consistently lend[s] credence to the notions that mental hospital patients are regularly exposed to various institutional policies and practices which deprive them of their basic human rights and which have a demoralizing and dehumaniz-

[15] Although we usually limit our inquiry of legislative history to remarks made during the debates on the floor of the House of Representatives or the Senate; see *State* v. *Golino,* 201 Conn. 435, 445, 518 A.2d 57 (1986); in this case those debates are unilluminating, the relevant statute, Public Acts 1971, No. 834, having been passed in both houses by unanimous consent without recorded discussion. 14 S. Proc., Pt. 7, 1971 Sess., p. 2966; 14 H.R. Proc., Pt. 13, 1971 Sess., pp. 5899–5900. We have occasionally, however, cast a wider net, when committee testimony contains particularly compelling evidence about the problem, issue or purpose underlying a statute. *State* v. *Magnano,* 204 Conn. 259, 277, 528 A.2d 760 (1987); *Nationwide Ins. Co.* v. *Gode,* 187 Conn. 386, 392 n.6, 395–96, 446 A.2d 1059 (1982); contra *Anderson* v. *Ludgin,* 175 Conn. 545, 554 n.8, 400 A.2d 712 (1978); *Spring* v. *Constantino,* 168 Conn. 563, 571–72 n.4, 362 A.2d 871 (1975). So it is here.

[16] The only other testimony before the judiciary committee preserved for judicial notice is that of Samuel S. Goldstein, an attorney, speaking as a past president of the Connecticut Association for Mental Health. His testimony was likewise directed at the practices of state mental hospitals. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1971 Sess., pp. 640–43.

ing effect on the individual," Voight then articulated the nexus between "these [the state's] practices and procedures . . . [and] those which [Senate Bill No.] 592 seeks to modify and control." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1971 Sess., p. 673. The most interesting revelation in Voight's testimony, however, is his reference to a report concerning an investigation at Fairfield Hills Hospital, a state mental health facility. General Statutes § 17-207b (b).

In 1969, in response to numerous letters from patients in state mental hospitals, and families,[17] Governor John N. Dempsey had ordered an investigation of Fairfield Hills Hospital. Thereafter, the state board of mental health appointed a task force to review the administrative and professional programs of Fairfield Hills Hospital. The report of the Task Force Study of Fairfield Hills Hospital was issued on May 15, 1970.[18]

---

[17] Some of these letters have been preserved in the Connecticut State Library, Box 11 of Governor John N. Dempsey's files labelled "State Departments and Agencies" in the folder entitled "Fairfield Hills Hospital." These letters bear eloquent witness to the deplorable conditions at Fairfield Hills Hospital. "My husband was a patient there for five months last year. For several months he was confined to a ward and never went outdoors for a breath of air. The only walk he got was from the dining room back to his room . . . . If I didn't get him out when I did I'm afraid he would be a vegetable by now." "I was a patient at Fairfield Hills and the [newspaper reports] are true. Signed, A Dehumanized Patient." "As a former patient at Fairfield Hills Hospital, I would like to relate my experiences there. When I entered the hospital . . . because I was very upset, I was placed in isolation. This consisted of being in a small room by yourself. The treatment I received there was as follows. I was stripped naked with no bed to lie on. I was then locked in. This went on for eight whole days. All this time without the use of a toilet. Therefore the floor took its place. The room had a small pane of safety glass. By which anyone going by could gaze in at me. Here by being on almost public display. When I got a little better and was placed on an open ward . . . I still saw and heard much of the same that I myself had been subjected to. . . . At night I went to sleep to the sounds of 3C [the isolation ward]. So I couldn't really get away from my own personal remembrance of the agony I went through there."

[18] This administrative report may be found in the Connecticut State Library, Box 11 of Governor John N. Dempsey's Files labeled "State Departments and Agencies," in the folder entitled "Fairfield Hills Hospital."

It documented, in detail, the extent to which then prevailing practices at Fairfield Hills Hospital departed from the standards set by the American Psychiatric Association, and described the factors that it found to have contributed to "the development and maintenance of a system which *inherently must result in violations and limitations of both human and civil rights.*"[19] (Emphasis added.) Id., p. 4. Having noted that "[t]he listed complaints have by now become classic legal problems in mental hospitals in many states, [that have been successfully resolved] by enactment of new legislation in New York and California"; id.; the task force report recommended that the legislature enact a patient's bill of rights to resolve problems that "may be generic to all the State hospitals in Connecticut." Id., p. 22; see generally comment, "The Mentally Ill in Connecticut—

---

[19] A representative example of such factors may be found in § I of the Task Force Study of Fairfield Hills Hospital entitled "Rights of Patients." The Task Force expressly found that "[i]nformation from a variety of sources supports the complaints that the dignity of patients is affronted, and that this often begins at time of admission, only in part due to confusion about admission policies. There is evidence of neglect, verbal abuse and dehumanization, without specific measures taken at higher levels to prevent these. Nurses, aides, and other personnel in direct contact with patients reported violations of patients' rights to toilet facilities, appropriate clothing, and privacy. While such violations might be ostensibly represented as a means of behavioral control, they seem also to be thinly disguised punitive measures promoting humiliation and denigrating individuality and individual needs.

"Complaints, again both from sources without as well as within the Fairfield Hills Hospital, pointed to limitations of privileges of visitation, access to mail, and others. The effects of these are difficult to view as other than punitive." Task Force Study of Fairfield Hills Hospital pp. 3–4. The substantive provisions of the patients' bill of rights bear a close relationship to the findings of the Task Force. See General Statutes § 17-206g, entitled "Communication by mail and telephone"; General Statutes § 17-206h, entitled "Visitors. Restrictions on mail, telephone and visitor privileges, when allowed"; General Statutes § 17-206i, entitled "Patient's Rights re clothing, possessions, money and access to records. List of rights to be posted."

A Survey," 6 Conn. L. Rev. 303, 340–48 (1973–74).[20] The close temporal relationship between the release of the Task Force Study of Fairfield Hills Hospital and the adoption of the substantive provisions of the patients' bill of rights necessarily leads us to conclude that the legislature intended in enacting § 17-206k to abrogate the state's sovereign immunity.[21] The Appellate Court was correct in holding that the trial court had jurisdiction to hear this case.

## II

The defendants' second claim of error challenges the Appellate Court's conclusion that the plaintiffs' complaint sufficiently states a cause of action for deprivation of the right to "humane and dignified treatment" that § 17-206c guarantees to "every patient" in state mental hospitals. The defendants do not challenge the Appellate Court's determination that § 17-206c creates a new statutory tort action. *Mahoney* v. *Lensink,* supra, 17 Conn. App. 140. They maintain, however, that, in the absence of relevant legislative history, the legislature must be presumed to have intended only a narrowly circumscribed guarantee of compassionate care. We are unpersuaded.

[20] We may also take judicial notice of a newspaper article occasioned by the public release of the Task Force study of Fairfield Hills Hospital. See *Moore* v. *Moore,* 173 Conn. 120, 123 n.1, 376 A.2d 1085 (1977). In light of the report's revelations about state practices as well as its recommendation for remedial legislation, Ernest A. Shepherd, then acting commissioner of mental health, announced that "his department is in the process of drafting a 'bill of patients' rights' for the next legislature to firm up the whole area." D. Rhinelander, Hartford Courant, May 28, 1970, p. 12, col. 2.

[21] As the United States Supreme Court stated in *Texas & Pacific Ry. Co.* v. *Rigsby,* 241 U.S. 33, 39, 36 S. Ct. 482, 60 L. Ed. 874 (1916): "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose special benefit the statute was enacted, the right to recover the damages from the party in default is implied . . . . " *Sullivan* v. *Little Hunting Park,* 396 U.S. 229, 239, 90 S. Ct. 400, 24 L. Ed. 2d 386 (1969).

In enacting § 17-206c, the legislature created a statutory cause of action that established a new tort liability, unknown to the common law, and therefore independent of common law negligence. See *Sanders v. Officers Club of Connecticut, Inc.,* 196 Conn 341, 348–49, 493 A.2d 184 (1985); *Pierce* v. *Albanese,* 144 Conn. 241, 249, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957). We must determine whether the plaintiffs' complaint falls within the conduct that the statute makes actionable.

Section 17-206c provides in pertinent part that "[e]very patient treated in any facility for the treatment of the mentally disordered shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy." The statute also provides that "[e]ach patient shall be treated in accordance with a specialized treatment plan suited to his disorder." Since the legislature chose not to attach a statutory definition to the phrase "humane and dignified treatment," we must interpret this language in light of the established canons of statutory construction. Our objective is to construe § 17-206c so as to " ' " 'ascertain and give effect to the apparent intent of the legislature.' " ' *Capalbo* v. *Planning & Zoning Board of Appeals,* 208 Conn. 480, 486, 547 A.2d 528 (1988) . . . ." *Shortt* v. *New Milford Police Department,* supra, 300–301. Because of the inherent ambiguity in the text of § 17-206c, we look to the purpose the statute is to serve as revealed by its legislative history and the circumstances surrounding its enactment. *Beloff* v. *Progressive Casualty Ins. Co.,* 203 Conn. 45, 54–55, 523 A.2d 477 (1987).

The Appellate Court concluded that the language of § 17-206c indicates generally that "a patient has a positive right to treatment, rather than simply a negative right to refuse it"; *Mahoney* v. *Lensink,* supra, 17 Conn. App. 138; and specifically that "a patient is entitled

to a specialized treatment plan tailored to his particular disorder." Id. The defendants take issue with this construction as too expansive. Contending that there is no relevant legislative history, the defendants maintain that the scope of this new statutory cause of action should be limited to "abstinence from procedures—such as strip searches, beatings, or deprivation of food—that would obviously fall short of the ideal." In support of this narrow construction, they remind us that the legislature would have recognized the difficulties that necessarily inhere in the decisions made by mental health professionals and would not have intended to subject such judgments to extensive oversight by lay judges and juries. *Youngberg* v. *Romeo,* 457 U.S. 307, 323, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). Accordingly, the defendants urge us to confine the statutory guarantee of "humane and dignified treatment" to deprivations that arise out of procedures that implicate sentient needs and feelings alone. Our analysis of the circumstances leading to the enactment of § 17-206c persuades us, however, that the Appellate Court's construction was correct.

The findings and recommendations of the Task Force Study of Fairfield Hills Hospital contain a cogent frame of reference for the construction of § 17-206c. In the section entitled "Treatment and Patient Care," the task force report reveals the antitherapeutic nature of the clinical environment prevalent at state mental health facilities: "The impression is one of a treatment atmosphere too rigid, and impoverished by restrictions placed on those who could provide vitality. Again the picture emerges of control from the top of sufficient degree as to influence the staff to behave in a fashion fostering administrative practices which create a life within the institution strikingly similar to that which may contribute to the origin of the patients' illnesses: A climate characterized by authoritarianism, loneliness,

alienation and depersonalization. Such goals as cleanliness seem often to have higher priority than involvement with patients in active interpersonal therapeutic relationships." Id., pp. 18–19. The thrust of these findings is that "the primary function of any psychiatric facility is to diagnose, treat and to restore mentally disturbed persons to an optimal level of functioning . . . . " Id., p. 18. The task force expressly, and the legislature by necessary implication, eschewed the custodial orientation implicit in the defendants' contention that the statutory guidelines should be limited to providing sentient care. In its adoption of a statutory right to humane and dignified treatment, the legislature intended to afford patients a meaningful right to treatment, consistent with the requirements of good medical practice.

In searching for the tenets of good medical practice, we can turn to the American Psychiatric Association's definition of the right to treatment as a comprehensive approach including " 'active intervention of a psychological, biological, physical, chemical, educational or social nature where application of the individualized treatment plan is felt to have a reasonable expectation of improving the patient's condition." R. Sadoff, Legal Issues in the Care of Psychiatric Patients: A Guide for the Mental Health Professional (1982) p. 32. Meaningful treatment thus requires not only basic custodial care but also an individualized effort to help each patient by formulating, administering and monitoring a "specialized treatment plan" as expressly mandated by § 17-206c. See generally *Rouse* v. *Cameron,* 373 F.2d 451 (D.C. Cir. 1966); T. Gutheil & P. Appelbaum, Psychiatry and the Law (1982) p. 108; D. Bazelon, Introduction, The Right To Treatment (D. Burris ed. 1969) p. 3.

The statutory responsibility for the formulation and subsequent monitoring of an appropriate treatment plan for each patient does not, however, encompass a

guarantee that the treatment plan will invariably produce the desired results. A poor outcome may occur despite the best possible medical practice. See generally S. Halleck, Law in the Practice of Psychiatry: A Handbook For Clinicians (1980) p. 14; R. Schwitzgebel, "The Right to Effective Mental Treatment," 62 Calif. L. Rev. 936 (1974). The standard for determining whether the provisions of § 17-206c have been violated thus cannot depend on the outcome of treatment. For similar reasons, the standard does not sound in negligence.

To recover for a violation of the statute, a plaintiff must prove, as the statute prescribes; *Sanders* v. *Officers Club of Connecticut, Inc.,* supra, 349; *London & Lancashire Indemnity Co.* v. *Duryea,* 143 Conn. 53, 59, 119 A.2d 325 (1955); that the conditions of his hospitalization were statutorily deficient. The plaintiff must allege and prove that the hospital failed initially to provide, or thereafter appropriately to monitor, an individualized treatment suitable to his psychiatric circumstances.[22] In assessing whether the plaintiff has met his burden of proof, the trier of fact must inquire not whether the hospital has made the best decision possible but rather whether its treatment plan was permissible and reasonable in view of the relevant information available and within a broad range of

[22] See generally T. Gutheil & P. Appelbaum, Psychiatry and the Law (1982). "Since hospital treatment of major mental illness is often a long-term process inducing a generally slow rate of change, there exists a danger that treatment processes will be instituted on the basis of admission symptomatology, and that this treatment will proceed unaltered and hence unresponsive to subtle (or even gross) improvement (or deterioration) in the patient's clinical state. This danger may be largely avoided by regular review of the treatment plan, addressing in particular whether or not the specific goals of the interventions have been achieved. This means, quite simply, deciding what is not working, and changing or stopping it; and deciding what is working and continuing that." Id., p. 109.

discretion.[23] *Tribby* v. *Cameron,* 379 F.2d 104, 105 (D.C. Cir. 1967). The issue, under § 17-206c, is whether the hospital made good faith efforts to improve the patient's mental health and not whether it succeeded in fulfillment of this goal. See *Rouse* v. *Cameron,* supra, 456.

From this perspective, we concur in the determination of the Appellate Court that the plaintiffs' complaint in this case states a cause of action for violation of § 17-206c. *Mahoney* v. *Lensink,* supra, 17 Conn. App. 140–41. In undertaking this determination, as the defendants note, we are "limited to the facts alleged in the plaintiff[s'] complaint." *Rowe* v. *Godou,* 209 Conn. 273, 278, 550 A.2d 1073 (1988). While it is true that the complaint does not expressly charge the defendants with a failure to formulate or monitor an individualized treatment plan, it does include allegations that the defendants wrongfully "failed to provide proper counseling, medication, supervision or suicide precautions, so as to prevent the decedent from acting on his suicidal tendencies." *Mahoney* v. *Lensink,* supra, 17 Conn. App. 138–39. Bearing in mind our responsibility to construe the complaint " 'in the manner most favorable to sustaining its legal sufficiency' "; *Warner*

[23] First credited with legal recognition of a right to treatment; see *Rouse* v. *Cameron,* 373 F.2d 451 (D.C. Cir. 1966); Chief Judge David Bazelon made the following statement in his introduction to a symposium on the subject: "To perform this task the judge need not be or even pretend to be a psychiatrist. His role is not to make independent judgments concerning treatment but rather to scrutinize the record to ensure that an expert more qualified than he has made a responsible exercise of his professional judgment. Courts have long fulfilled this role in supervising administrative agencies. Every regulatory agency is charged with the enforcement of a broad statute or statutes which require highly specialized training and knowledge; the legislature provides a broad standard, the administrator develops workable rules and procedures, and the court ensures that the standard and rules are evenhandedly applied to individuals. The role of the court in reviewing determinations of a mental health administrator should be similar to its role in any administrative review." D. Bazelon, Introduction, The Right To Treatment (D. Burris ed. 1969) p. 3.

v. *Konover,* 210 Conn. 150, 156, 553 A.2d 1138 (1989); *Michaud* v. *Wawruck,* 209 Conn. 407, 408, 551 A.2d 738 (1988); we conclude that the complaint sufficiently invokes § 17-206c.

### III

We turn, finally, to the plaintiffs' cross appeal, which challenges the validity of the Appellate Court's ruling that their complaint fails to state a cause of action under § 17-206b. The plaintiffs assert that § 17-206b was intended to secure for mental hospital patients a state statutory remedy for the violation of substantive liberty interests similar to that provided by federal law under 42 U.S.C. § 1983. These substantive liberty interests encompass, according to the plaintiffs, a right to treatment and personal security. The Appellate Court rejected this interpretation, holding instead that the due process guarantee contained in § 17-206b protects only those rights "that a patient may have held absent hospitalization or treatment"; *Mahoney* v. *Lensink,* supra, 17 Conn. App. 137–38; such as the right to vote, contract or hold property. We agree with the plaintiffs that the Appellate Court construed § 17-206b too narrowly.

Proper construction of § 17-206b must begin with an examination of its text, which states, in relevant part, that "[n]o patient hospitalized or treated in any public or private facility for the treatment of the mentally disordered shall be deprived of any personal, property or civil rights, including the right to vote, hold or convey property, and contract, except in accordance with due process of law . . . . " The defendants contend that, on its face, the statutory linkage between "personal, property or civil rights" and "the right to vote, hold or convey property, and contract" demonstrates the legislature's intention to restrict the scope of § 17-206b to those expressly enumerated rights. They rely on the

proposition that, in the absence of contrary indication, statutory itemization demonstrates that the legislature intended the list to be exclusive. *Kinney* v. *State*, 213 Conn. 54, 63, 566 A.2d 670 (1989); *The B. F. Goodrich Co.* v. *Dubno,* 196 Conn. 1, 6, 490 A.2d 991 (1985).

Because the statutory itemization in § 17-206b speaks of "personal, property or civil rights, *including* the right to vote, hold or convey property, or contract," (emphasis added) the defendants' contention is unpersuasive. The legislature's use of the word "including" rather than the commonly utilized expression, "shall include," evinces an intention to provide an expansive interpretation of the rights protected by § 17-206b. As we have recognized in the past, the word "include" may be considered a word of enlargement as well as a word of limitation. *State* v. *White,* 204 Conn. 410, 422–23, 528 A.2d 811 (1987); *Hartford Electric Light Co.* v. *Sullivan,* 161 Conn. 145, 150, 285 A.2d 352 (1971). Since the most likely common use of the term "shall include" is one of limitation; *Hartford Electric Light Co.* v. *Sullivan,* supra; the statutory omission of the word "shall" is telling. Webster's Seventh New Collegiate Dictionary states that the word "include" "suggests the containment of something as a constituent, component, or subordinate part of a larger whole." The legislative choice of "including" is more likely, as a matter of common sense, to connote that the legislature intended, in § 17-206b, that the listed rights be a vehicle for enlargement rather than limitation. See *Murach* v. *Planning & Zoning Commission,* 196 Conn. 192, 196, 491 A.2d 1058 (1985).

Furthermore, an expansive construction of "personal, property or civil rights" is consistent with the usage and interpretation of similarly phrased rights guaranteed by 42 U.S.C. § 1983. The scope of 42 U.S.C. § 1983 is derived, in turn, from the mandates of the due process clause of the United States constitution,

and includes not only those rights recognized by the Appellate Court that a patient holds absent hospitalization but more expansively encompasses a right to treatment that results because of hospitalization. Interpreting § 17-206b in conformity with such constitutional requirements is fully consistent with the well established principle of statutory construction that " 'a court is justified in holding that a statute was intended to be subject to constitutional requirements, and that those requirements are to be considered as embodied in the statute, if its terms do not exclude such requirements.' *Grega* v. *Warden,* 178 Conn. 207, 210, 423 A.2d 873 (1979)." *Bridgeport Bowl-O-Rama, Inc.* v. *Zoning Board of Appeals,* 195 Conn. 276, 283, 487 A.2d 559 (1985). We are therefore persuaded that the freedom from deprivation of "any personal, property or civil rights" provided in § 17-206b includes not only those statutory rights expressly enumerated, but necessarily incorporates as well the freedom from deprivation of "any rights, privileges, or immunities secured by the Constitution" as guaranteed under 42 U.S.C. § 1983.

Although the Appellate Court was correct in concluding that the plaintiffs' complaint did not allege a violation of the rights specifically enumerated in § 17-206b, that court had no occasion to consider whether the complaint might pass muster under the more expansive construction of § 17-206b as encompassing constitutionally protected liberty interests. The relevant portions of the plaintiffs' complaint allege that the decedent was entitled as a patient in a state mental health facility to such substantive services as "proper counseling, medication, supervision [and] suicide precautions." *Mahoney* v. *Lensink,* supra, 17 Conn. App. 138–39. As a general matter, the state has no constitutional duty to provide such substantive services for those within its borders. *Youngberg* v. *Romeo,* supra, 317; see *Maher* v. *Roe,* 432 U.S. 464, 469, 97 S. Ct. 2376, 53 L. Ed.

2d 484 (1977) (medical treatment). When a person has been institutionalized within a state mental health facility, however, the state voluntarily assumes a duty to provide treatment; *Youngberg* v. *Romeo,* supra; under conditions of reasonable care and safety; id., 324; and the patient acquires, by virtue of his hospitalization, a constitutionally protected liberty interest under 42 U.S.C. § 1983 in these obligatory services. Moreover, "[o]nce the State assumes responsibility for a patient by admitting him to a State mental hospital that is operating under State authority, the State is acting under color of law. See *O'Connor* v. *Donaldson,* 422 U.S. 563, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975) . . . ." *Seide* v. *Prevost,* 536 F. Sup. 1121, 1136 (S.D.N.Y. 1982).

Regardless of whether a patient's admission status is voluntary or involuntary, the state may not subject any citizen "to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983; *Seide* v. *Prevost,* supra. While some cases have held that the constitutionally protected interest in the right to treatment and a safe environment available under 42 U.S.C. § 1983 actions is limited to patients who are confined by the state involuntarily; *Wyatt* v. *Aderholt,* 503 F.2d 1305, 1312 (5th Cir. 1974); or to voluntary patients who allege a sufficient degree of helplessness; *Harper* v. *Cserr,* 544 F.2d 1121, 1123 (1st Cir. 1976); these refinements are not relevant to the construction of § 17-206b. Our statute does not purport to distinguish the rights afforded to mental health patients according to their admission status. We are persuaded, therefore, that the federally recognized right to treatment and to a safe environment applies to all patients within state mental health facilities without regard to the voluntary or involuntary nature of their confinement. This construction finds support in a comparable ruling by the Supreme Court of West Vir-

ginia. *E. H.* v. *Matin,* 284 S.E.2d 232, 237 (W. Va. 1981); see also *Goodman* v. *Parwatikar,* 570 F.2d 801, 804 (8th Cir. 1978); *Seide* v. *Prevost,* supra.

Incorporation of 42 U.S.C. § 1983 standards into § 17-206b does not automatically resolve the question of the sufficiency of the plaintiffs' complaint. The United States Supreme Court has held, in the context of § 1983 actions, that acts of mere negligence do not violate an individual's rights under the due process clause of the United States constitution; *Davidson* v. *Cannon,* 474 U.S. 344, 346–47, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986); *Daniels* v. *Williams,* 474 U.S. 327, 330–33, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). We must therefore ascertain whether the allegations of this complaint rise above negligence. Reading the complaint as we must in a light most favorable to the plaintiffs, we conclude that it sufficiently states a cause of action under § 17-206b. As the Appellate Court appropriately noted, "facts similar to these alleged here by the plaintiff[s], that is, failure to restrict or control a patient so as to prevent suicide, have been held to be sufficient to allege such a degree of wanton neglect so as to state a cause of action for violation of a patient's rights under 42 U.S.C. § 1983." *Mahoney* v. *Lensink,* supra, 17 Conn. App. 140 n.5; see *Harper* v. *Cserr,* supra, 1124; cf. *Guglielmoni* v. *Alexander,* 583 F. Sup. 821, 827 (D. Conn. 1984) (complaint that alleged prisoner's civil rights were violated when inadequate supervision and treatment provided during his incarceration resulted in suicide stated a cognizable § 1983 claim, despite contention that eighth amendment does not reach instances of deliberate self-injury). Since we hold that § 17-206b necessarily incorporates those rights afforded under 42 U.S.C. § 1983, it would be inconsistent to find the complaint insufficient for purposes of alleging a violation of § 17-206b at this preliminary stage in the proceedings.

Accordingly, on the appeal, there is no error; on the cross appeal, there is error, the judgment of the Appellate Court is reversed in part and the case is remanded to that court with direction to remand the case to the trial court for further proceedings not inconsistent with this opinion.

In this opinion the other justices concurred.