ELAINE WISEMAN, ADMINISTRATOR (ESTATE OF BRYANT WISEMAN) *v.* JOHN J. ARMSTRONG ET AL.
(SC 16988)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued February 11—officially released June 29, 2004

*Ann E. Lynch,* assistant attorney general, with whom were *Terrence M. O'Neill,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Gregory T. D'Auria,* associate attorney general, for the appellants (defendants).

*Antonio Ponvert III,* for the appellee (plaintiff).

*C. Joan Parker,* assistant commission counsel II, filed a brief for the commission on human rights and opportunities as amicus curiae.

*Nancy B. Alisberg* filed a brief for the office of protection and advocacy for persons with disabilities as amicus curiae.

*Christopher G. Wall* filed a brief for the Lieutenant's Union of the state of Connecticut as amicus curiae.

*Ben A. Solnit* filed a brief for the Connecticut Psychiatric Society et al. as amici curiae.

*Stephen E. Nevas* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the trial court properly determined that the

provisions of General Statutes §§ 17a-540 through 17a-550, which is known as the patients' bill of rights, apply to correctional institutions operated by the state department of correction. We answer that question in the negative. Accordingly, we reverse the judgment of trial court.

This appeal arises out of the following factual background. On November 17, 1999, twenty-eight year old Bryant Wiseman died while he was incarcerated at the Garner correctional institution (Garner). The decedent was mentally ill, and at the time of his death, he had been diagnosed as suffering from paranoid schizophrenia. On December 10, 2002, the plaintiff, Elaine Wiseman, as administrator of the decedent's estate, filed a twelve count complaint against the defendants,[1] alleging that the department of correction's physicians, nurses and other medical workers failed to provide adequate and proper medical care, supervision and medication to the decedent, allowed his mental illness to go untreated or

[1] The defendants named in the complaint were: John J. Armstrong, the commissioner of correction; Jack Tokarz, the deputy commissioner of correction; the state of Connecticut; the department of correction; the University of Connecticut health center (health center); Garner; Michael A. Pace, Kevin Cowser, James E. Reilly, Donald J. Hebert, Robert G. Stack, Jose Zayas, Kevin J. Dandolini, Angelo P. Gizzi, Edwin Myers, William Smith, Vaughn Willis, Brian C. Bradway and Frank Mirto, who were officers, supervisors and other officials at Garner; Iris Prescott, Roberta C. Leddy, Clo Barsotti, Ginger Bochicchio, Gail N. Fredette and Mingzer Tung, who were medical workers assigned to Garner; William Joughin, Reginald Hoffler and Oscar Maldonado, who were employees of the department of correction assigned to monitor the decedent's mental illness; Andre Chouinard and William Scott, who were lieutenants in the department of correction; Steven Sanelli, Jimmy Guerrero, Jeffery Howes, Maurellis Powell, Dennis Camp, Raymond Brodeur and Moises Padilla, who were correction officers with the department of correction; and Ann Marie Storey, who was a nurse for the health center. On February 27, 2003, the fourth count of the plaintiff's complaint, which alleged deliberate indifference to the decedent's safety under 42 U.S.C. § 1983, against Chouinard, Scott, Sanelli, Guerrero, Howes, Powell, Camp, Brodeur, Padilla and Storey, was dismissed by the trial court. The propriety of that dismissal is not before us in the present appeal.

inadequately treated, and permitted the decedent to become paranoid and aggressive under circumstances that they knew would lead to a violent confrontation with other inmates and correction staff.[2] On January 10, 2002, the defendants filed an amended motion to dismiss, claiming, inter alia, that the ninth,[3] tenth[4] and eleventh[5] counts of the plaintiff's complaint were improper because the patients' bill of rights does not apply to correctional institutions. Those three counts were all based upon the plaintiff's claim that "[t]he facilities of the Connecticut [d]epartment of [c]orrection, including the Garner [c]orrectional [i]nstitution, and the University of Connecticut [h]ealth [c]enter are '[f]acilities' within the meaning of . . . § 17a-540 (a)."

[2] On August 29, 2002, the state claims commissioner had granted the plaintiff, as administrator of the estate of the decedent, permission to bring an action against the state for medical malpractice.

[3] Count nine of the plaintiff's complaint alleged that the defendants failed to provide humane and dignified treatment to the decedent in violation of General Statutes § 17a-542, which provides in relevant part: "Every patient treated in any facility for treatment of persons with psychiatric disabilities shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy. . . ."

[4] Count ten of the plaintiff's complaint alleged that the defendants failed to provide a specialized treatment plan for the decedent in violation of General Statutes § 17a-542, which provides in relevant part: "Each patient shall be treated in accordance with a specialized treatment plan suited to his disorder. Such treatment plan shall include a discharge plan which shall include, but not be limited to, (1) reasonable notice to the patient of his impending discharge, (2) active participation by the patient in planning for his discharge and (3) planning for appropriate aftercare to the patient upon his discharge."

[5] Count eleven of the plaintiff's complaint alleged that the defendants failed to conduct psychiatric examinations of the decedent in violation of General Statutes § 17a-545, which provides: "Every patient hospitalized under any of sections 17a-540 to 17a-550, inclusive, shall receive a physical examination within five days of his hospitalization, and at least once each year thereafter. Every patient shall be examined by a psychiatrist within forty-eight hours of his hospitalization, and at least once each six months thereafter. Reports of all physical and psychiatric examinations shall be completed and signed by the examining physicians and made a part of the patient's permanent clinical record."

On February 27, 2003, the trial court denied the defendants' motion to dismiss, noting that the term "other facility," as that term is used in the patients' bill of rights,[6] was "broad enough to include the facilities of the [d]epartment of [c]orrection. This is clear on its face."[7] On March 11, 2003, the defendants filed a motion for reconsideration or articulation in light of this court's subsequent opinion in *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003), which "restat[ed] the process by which we interpret statutes . . . ."[8] The trial court denied the defendants' request for reconsideration, yet provided an articulation of its decision in light of *Courchesne*. More specifically, the trial court found that even under the purposive approach to statutory interpretation set forth in *Courchesne*, "the legislative history is not sufficiently persuasive to overcome the plain language of the statute." The defendants appealed from the judgment of the trial court to the Appellate Court. Prior to argument before the Appellate Court, Chief Justice Sullivan granted the defendants' petition for certification to appeal to this court pursuant to General Statutes § 52-265a.[9] This appeal followed.

---

[6] General Statutes § 17a-540 (a) defines " '[f]acility' " as "any inpatient or outpatient hospital, clinic, or *other facility* for the diagnosis, observation or treatment of persons with psychiatric disabilities . . . ." (Emphasis added.)

[7] The trial court did grant the defendants' motion to dismiss the fourth count of the plaintiff's complaint. See footnote 1 of this opinion. The propriety of that ruling is not before this court in the present appeal.

[8] In *Courchesne*, this court rejected the plain meaning rule, and restated the process of statutory interpretation as "involv[ing] a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *State* v. *Courchesne*, supra, 262 Conn. 577.

[9] General Statutes § 52-265a provides in relevant part: "(a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay

On appeal, the defendants claim that the trial court improperly: (1) concluded that a correctional institution is a "facility" subject to the provisions of the patients' bill of rights; (2) disregarded the well settled tenet of statutory interpretation that a statutory scheme is to be considered as a whole; (3) disregarded No. 97-016 of the Opinions of the Connecticut Attorney General, which concluded that the patients' bill of rights did not apply to correctional institutions; and (4) disregarded this court's opinion in *Mahoney* v. *Lensink*, 213 Conn. 548, 569 A.2d 518 (1990), which thoroughly reviewed the history of the patients' bill of rights. In response, the plaintiff claims that: (1) the legislative history of the patients' bill of rights contains no " 'strong' " or " 'persuasive' " support to overcome the plain language of the statute, as required by *State* v. *Courchesne*, supra, 262 Conn. 537; (2) the application of the patients' bill of rights to correctional institutions does not present an insurmountable conflict with regard to other statutes concerning the rights of prisoners; (3) No. 97-016 of the Opinions of the Connecticut Attorney General is irrelevant to the issue presented in this appeal; and (4) the defendants' interpretation of the patients' bill of rights (a) conflicts with the plain language of the statute, as well as the decisions of this court and other state and federal courts, (b) poses severe practical difficulties and inconsistent standards for psychiatrists and other mental health workers, and (c) violates the public policy of this state. We agree with the defendants. Accordingly, we reverse the judgment of the trial court.

may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. . . .

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice. . . ." See also Practice Book § 83-1 (addressing appeals brought pursuant to § 52-265a).

We begin by setting forth the applicable standard of review. The defendants' claims involve the meaning of the term "facility" as that term is used in our patients' bill of rights. "Issues of statutory construction raise questions of law, over which we exercise plenary review." *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 588, 830 A.2d 164 (2003). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Jones* v. *Kramer*, 267 Conn. 336, 343, 838 A.2d 170 (2004).[10] In addition, "[b]ecause the patients' bill of rights is remedial in nature, its provisions should be liberally construed in favor of the class sought to be benefited." *Mahoney* v. *Lensink*, supra, 213 Conn. 556.

With these principles in mind, we turn to the defendants' claims. "As with all issues of statutory interpretation, we look first to the language of the statute." (Internal quotation marks omitted.) *Spears* v. *Garcia*, 263 Conn. 22, 28–29, 818 A.2d 37 (2003). A " '[f]acility' "

---

[10] Public Acts 2003, No. 03-154, § 1, provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." We note that, in the present case, the relevant statutory text and the relationship of that text to other statutes is not plain and unambiguous. Accordingly, our analysis does not involve this new legislation.

subject to the provisions of the patients' bill of rights is defined as "any inpatient or outpatient hospital, clinic, or *other facility* for the diagnosis, observation or treatment of persons with psychiatric disabilities . . . ." (Emphasis added.) General Statutes § 17a-540 (a). In ruling on the defendants' motion to dismiss, the trial court determined that the term " 'other facility' is broad enough to include the facilities of the [d]epartment of correction. This is clear on its face." We disagree.[11]

As an initial matter, we note that the trial court improperly circumscribed its analysis to an interpretation of the term "other facility" in the abstract, rather than properly analyzing that term within the context of the statute in which it is contained. A statute is enacted as a whole and must be read as a whole rather than as separate parts or sections. *Badolato* v. *New Britain*, 250 Conn. 753, 760, 738 A.2d 618 (1999). Further, "[w]ords in a statute must be given their plain and ordinary meaning . . . unless the context indicates that a different meaning was intended." (Internal quotation marks omitted.) *Gelinas* v. *West Hartford*, 225 Conn. 575, 584, 626 A.2d 259 (1993). While the term "other facility" might be very broad in the abstract, within the context of § 17a-540 (a), the legislature narrowed its meaning by modifying it with the words "*for* the diagnosis, observation or treatment of persons with psychiatric disabilities . . . ." (Emphasis added.) The word "for" requires that any "other facility" subject to the patients' bill of rights must be one *for which* the main purpose is "diagnosis, observation or treatment."[12] Thus, in order to qualify as a "facility" subject to the provisions of the patients'

---

[11] Neither party in the present case contends that a correctional institute could properly be classified as either a "hospital" or "clinic" under § 17a-540 (a). Accordingly, our analysis will focus solely on whether a correctional institute is an "other facility" under § 17a-540 (a).

[12] The word "for" is "used as a function word to indicate purpose . . . [or] to indicate an intended goal . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).

bill of rights, a correctional institute must not be just any "other facility," but rather must be any "other facility *for the diagnosis, observation or treatment of persons with psychiatric disabilities . . . .*" (Emphasis added.) General Statutes § 17a-540 (a).[13] When viewed in this proper context, we are not persuaded that the meaning of "other facility for the diagnosis, observation or treatment of persons with psychiatric disabilities," as used by the patients' bill of rights in § 17a-540 (a), plainly encompasses facilities operated by the department of correction, namely, correctional institutions.

The dictionary references the entry for "correctional institution" to the entry for "prison," which is defined as "[a] state or federal facility of confinement for convicted criminals, esp[ecially] felons." Black's Law Dictionary (7th Ed. 1999); see also Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) (defining "prison" as, inter alia, "a place of confinement"). Furthermore, "correction," the root of the word "correctional," is defined as "the treatment and rehabilitation of offenders through a program involving penal custody, parole, and probation . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993). We are aware that correctional institutions

---

[13] We also note that General Statutes § 17a-542 provides that "[e]very patient treated in *any facility for treatment of persons with psychiatric disabilities* shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy. . . ." (Emphasis added.) Thus, within the patients' bill of rights in § 17a-540 (a), not only is the scope of the secondary term "other facility" restricted by the words that follow it; "for the diagnosis, observation or treatment of persons with psychiatric disabilities"; but the main statutory word "facility" is similarly restricted by the terms that follow it: *"for treatment of persons with psychiatric disabilities . . . ."* (Emphasis added.) See *Phoebe G.* v. *Solnit,* 252 Conn. 68, 70 n.2, 743 A.2d 606 (2000) ("[i]f the trial court on remand determines that the plaintiff's present residential placement qualifies as *a private facility for the treatment of persons with psychiatric disabilities,* she can continue to make claims under the patients' bill of rights" [emphasis added]). This restriction on the term "facility" further counsels against the interpretation urged by the plaintiff in the present case.

do provide an increasing amount of psychiatric services to inmates. Indeed, the correctional facility in which the decedent was housed, Garner, which is a level 4 high-security facility, contains a mental health unit that "operates an intensive mental health program for inmates who are assessed with serious mental health concerns." Nevertheless, these services are incidental to the true purpose of correctional institutions generally, and Garner specifically—the confinement of individuals convicted of felonies. See, e.g., *State* v. *Velasco*, 253 Conn. 210, 234 n.17, 751 A.2d 800 (2000) (noting that court could properly take judicial notice of fact that Garner qualified as "correctional institution"); *State* v. *Faust*, 237 Conn. 454, 471, 678 A.2d 910 (1996) (concluding that trial court's instruction to jury that it need not consider whether Garner was correctional institution, if it found that "[the incident] occurred at Garner," constituted harmless error beyond reasonable doubt). In comparison, this court has recognized that "[t]he thrust of [the task force findings behind the creation of the patients' bill of rights] is that 'the *primary function [behind] any psychiatric facility* is to diagnose, treat and to restore mentally disturbed persons to an optimal level of functioning . . . .' " (Emphasis added.) *Mahoney* v. *Lensink*, supra, 213 Conn. 565. Accordingly, we conclude, contrary to the finding of the trial court, that the term "*other facility* for the diagnosis, observation or treatment of persons with psychiatric disabilities" contained in § 17a-540 (a) does not plainly and unambiguously encompass correctional institutions.[14] (Emphasis added.)

This conclusion is buttressed when the term "other facility" is interpreted alongside the two other terms

[14] Because we reject the trial court's finding that the term "other facility," on its face, clearly encompasses correctional institutions, we need not address the plaintiff's claim that there is insufficient evidence in the legislative history of the patients' bill of rights to overcome this plain meaning.

used in § 17a-540 (a) to define " '[f]acility,' " namely, "hospital" and "clinic." See footnote 6 of this opinion. This court has consistently stated that "statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant"; (internal quotation marks omitted) *Segal* v. *Segal*, 264 Conn. 498, 507, 823 A.2d 1208 (2003); and that "[w]e consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation." *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 307, 732 A.2d 144 (1999). Neither hospitals nor clinics are ordinarily considered to be synonymous with prisons or correctional institutions. See footnote 11 of this opinion. To the contrary, a hospital is commonly defined as "an institution where the sick or injured are given medical or surgical care . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).[15] Similarly, a clinic is commonly understood to mean "a facility (as of a hospital) for diagnosis and treatment of outpatients . . . ." Id. These definitions stand in stark contrast to the commonly understood definition of correctional institution, which focuses squarely on confinement. Therefore, interpreting the term "other facility" alongside "hospital" and "clinic" further persuades us that the term "other facility" does not encompass correctional institutions.

---

[15] We note further that in General Statutes § 17a-512, the legislature provided: "As used in sections 17a-499, 17a-509, 17a-512 to 17a-517, inclusive, 17a-520 and 17a-521, the term 'hospital' shall mean a hospital for psychiatric disabilities or a mental hospital or institution which is administered by the Department of Mental Health and Addiction Services." Thus, within the previously identified sections, the legislature defined "hospital" more narrowly than the common and ordinary meaning. Put another way, in § 17a-512, the legislature limited the term " 'hospital' " to those hospitals specifically dealing with psychiatric disabilities. Although the definition set forth in § 17a-512 does not apply to the patients' bill of rights, we nevertheless find that it strongly counsels against interpreting the term "other facility" in a manner that would include correctional institutions.

When construing § 17a-540 (a), "[w]e are [also] guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . ." (Internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 310, 819 A.2d 260 (2003). "Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction. *Schiano* v. *Bliss Exterminating Co.*, 260 Conn. 21, 42, 792 A.2d 835 (2002)." (Internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory*, supra, 310. The defendants claim that numerous provisions of the patients' bill of rights are incompatible with the statutes and regulations that govern the operation of correctional institutions. Therefore, the defendants contend, the legislature could not have intended for the patients' bill of rights to apply to correctional institutions. We agree.

The patients' bill of rights provides that "[n]o patient may be placed involuntarily in seclusion or a mechanical restraint unless necessary because there is *imminent physical danger to the patient or others and a physician so orders*. A written memorandum of such order, and the reasons therefor, shall be placed in the patient's permanent clinical record within twenty-four hours." (Emphasis added.) General Statutes § 17a-544 (a). In comparison, department of correction administrative directive 6.5, § 4 (B), provides that "staff may immediately use force and/or apply restraints when an inmate's behavior constitutes an immediate threat to self, others, property or to the safety and security of the institution." See also id., § 8 (detailing procedures for authorized use of restraints). As administrative directive 6.5 illustrates, it simply is not always possible

within a correctional institution to wait for a physician's order before restraining an inmate. Indeed, the very nature of a correctional institute often *requires* individuals to be restrained in some manner or to be placed in seclusion under immediate and unexpected circumstances.[16]

Count ten of the plaintiff's complaint alleges that the defendants violated the patients' bill of rights by failing to provide the decedent with a specialized treatment plan. More specifically, the plaintiff claims that the patients' bill of rights requires that each patient be treated in accordance with a special treatment plan that includes "(1) reasonable notice to the patient of his impending discharge, (2) active participation by the patient in planning for his discharge and (3) planning for appropriate aftercare to the patient upon his discharge." General Statutes § 17a-542. This statute is in direct contradiction to other statutes that govern the movement of individuals in the custody of the department of correction,[17] whether from a hospital for psychiatric disability to a correctional institution, or between

---

[16] As we noted in *Washington* v. *Meachum*, 238 Conn. 692, 733–34, 680 A.2d 262 (1996), " '[p]rison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.' *Procunier* v. *Martinez*, [416 U.S. 396, 404–405, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974)]."

[17] A "person in the custody of the [c]ommissioner of [c]orrection or confined in any institution or facility of the [d]epartment of [c]orrection" is defined as both an " 'inmate' " and a " 'prisoner.' " General Statutes § 18-84.

correctional institutions. See, e.g., General Statutes § 17a-515 ("if the court revokes the order of commitment, the person shall be returned to any institution administered by the [d]epartment of [c]orrection *as the [c]ommissioner of [c]orrection shall designate*" [emphasis added]); General Statutes § 18-86 ("[t]he commissioner may transfer any inmate of any of the institutions or facilities of the department to any other such institution or facility . . . when it appears *to the commissioner* that the best interests of the inmate or the other inmates will be served by such action" [emphasis added]). Neither of these statutes allow for inmate participation in the planning or execution of a transfer. Therefore, the rights granted to patients under the patients' bill of rights to assist with planning for discharge from the hospital for psychiatric disorders simply do not apply when the person being discharged is a convicted felon subject to an additional period of incarceration.

This contradiction between the rights provided by the patients' bill of rights and those expressly denied to inmates by other statutes and regulations is not limited to the previous two examples. Compare General Statutes § 17a-541 (no patient shall be deprived of any personal, property or civil rights, including right to vote, unless first having been declared incapable)[18] with Gen-

---

[18] A finding of incapability is to be made pursuant to General Statutes §§ 45a-644 to 45a-662. Under those statutes, before the aforementioned rights may be denied to an individual involuntarily, the court must set a hearing and give the subject individual notice of, inter alia, the time and place of the hearing, the facts alleged in the application for involuntary representation, and the legal consequences of the representation sought by the petitioner. General Statutes § 45a-659. Additionally, the court shall receive either written or testimonial evidence from a physician who has examined the subject individual, as well as other evidence that may be available and relevant. General Statutes § 45a-650 (a). These extensive notice and hearing requirements are simply incompatible with the inherent nature of a correctional institution, where an inmate may need to be deprived of a property or personal right upon sudden notice or in accordance with a general prison regulation.

eral Statutes § 9-46 (a) ("[a] person shall forfeit such person's right to become an elector and such person's privileges as an elector upon conviction of a felony and committal to the custody of the [c]ommissioner of [c]orrection for confinement"); General Statutes § 17a-546 (a) (stating that every patient shall be permitted to communicate by sealed mail and make and receive telephone calls except in limited instances) with *Washington* v. *Meachum*, 238 Conn. 692, 728, 680 A.2d 262 (1996) (rejecting challenge to department of correction regulations[19] governing monitoring of inmates' nonprivileged mail and telephone calls because monitoring was needed to "further the substantial governmental interests in security, order and rehabilitation"); General Statutes § 17a-547 (a) and (d) ("[e]very patient *shall be permitted* to receive visitors at regular visiting hours" except if "the head of the hospital determines that it is *medically harmful* for the patient to receive visitors" [emphasis added]) with department of correction administrative directive 10.6, § 1 ("The [d]epartment shall provide for visits to inmates in accordance with sound correctional practices. Except as required by law visitation shall be considered a privilege and no inmate shall have entitlement to a visit.") and *Henderson* v. *Commissioner of Correction*, 66 Conn. App. 868, 869, 786 A.2d 450 (2001) ("[t]he habeas court properly concluded that the petitioner does not have a liberty interest in access to visitors"); and General Statutes § 17a-548 (a) ("Any patient shall be permitted to wear his or her own clothes; to keep and use personal possessions, including toilet articles . . . [and] to have access to individual storage space for such possessions . . . . *These rights shall be denied only if [an authorized party] determines that it is medically harmful* to the

---

[19] For example, "[i]nmate communications by mail and by telephone may be inspected, reviewed, read, listened to, recorded, restricted, or prohibited in accordance with [other department of correction regulations] . . . ." Regs., Conn. State Agencies § 18-81-29.

patient to exercise such rights." [Emphasis added.]) with department of correction administrative directive 6.10, § 1 ("[a]n inmate may possess only that property authorized for retention upon admission to the facility, issued while in custody . . . or approved at the facility"). This comparison makes clear that the rights provided by the patients' bill of rights conflict with many of the statutes and regulations that govern individuals in the custody of the department of correction. Acceptance of the plaintiff's claim, therefore, would result in a situation where "prisoners undergoing mental health care in prison would be entitled, by . . . their mere status as mental health patients, to a whole panoply of rights and privileges not afforded to ordinary prisoners not receiving mental health treatment. . . . The legislature could not have intended such a disparity between those prisoners receiving mental health care and those who were not."[20] (Citations omitted.) *Baugh* v. *Woodward*, 56 N.C. App. 180, 183, 287 S.E.2d 412, appeal dismissed, 305 N.C. 759, 292 S.E.2d 574 (1982).[21]

---

[20] We recognize that our conclusion in the present case could create a disparity between inmates with psychiatric disabilities who are housed in a correctional institution, and not subject to the patients' bill of rights, and inmates with psychiatric disabilities who are transferred to a facility that is subject to the patients' bill of rights. See General Statutes §§ 17a-513 through 17a-520 (addressing transfer of inmates to hospitals for psychiatric disabilities). To what extent the patients' bill of rights applies to inmates in the custody of the department of correction, yet who are housed in a facility that is subject to the patients' bill of rights, however, is not before us in the present appeal.

[21] In *Baugh*, the issue before the court was whether the term "treatment facility," as used in the North Carolina patients' bill of rights, included correctional institutions. *Baugh* v. *Woodward*, supra, 56 N.C. App. 183. " '[T]reatment facility' " was defined as "any hospital or institution operated by the State of North Carolina and designated for the admission of any person in need of care and treatment due to mental illness." Id.; see also *Volden* v. *Koenig*, 249 Wis. 2d 284, 291, 638 N.W.2d 906 (2001) (concluding that prisoner was not in " 'treatment facility' " when in custody of sheriff for transport to, from and during involuntary commitment hearing).

The plaintiff presents one additional case in support of her claim that the patients' bill of rights should apply to correctional institutions. More specifically, the plaintiff cites *Hines* v. *Anderson*, 439 F. Sup. 12, 16 (D.

Furthermore, the legislature explicitly provided in § 17a-547 (f) that "[n]o restriction of any patient's rights to send and receive mail, make and receive telephone calls, or receive visitors shall be made in any manner, or for any reasons, other than prescribed in section 17a-546 and this section." As noted previously in this opinion, when interpreting statutes we presume that the legislature intended to create a harmonious and continuous body of law. *Hatt* v. *Burlington Coat Factory*, supra, 263 Conn. 310. Accordingly, we simply cannot conclude that the legislature, having given the commissioner of correction significant power to regulate the conduct of individuals in the custody of the department of correction; see, e.g., General Statutes § 17a-515; nevertheless intended for § 17a-547 (f) to preclude the commissioner of correction from exercising that power except in the limited situations set forth in subsection (f). Put another way, the sheer volume of discrepancies between the patients' bill of rights and the statutes and regulations governing correctional institutions, and the degree of discrepancy involved, persuades us that the term "other facility" does not encompass correctional institutions.

This conclusion gains additional support when the provisions of the patients' bill of rights are interpreted in the context of the entire statutory scheme of this

Minn. 1997), and states that the court in *Hines* "held [that] [t]o the fullest extent possible in the prison environment, the provisions of Minn. Stat. § 144.651 (1974), commonly known as the [p]atients' [b]ill of [r]ights, shall apply to inmates who receive medical care and treatment at the Minnesota [s]tate [p]rison." (Internal quotation marks omitted.) This is not a proper representation of the outcome of that case. *Hines* v. *Anderson*, supra, 15, involved a class action alleging that the medical facilities and care at a Minnesota state prison violated the eighth and fourteenth amendments to the United States constitution. Prior to trial, both parties "agreed to a stipulation settling this case and providing for the terms and provisions of this consent decree." Id., 16. Accordingly, the language cited by the plaintiff is based on an agreement between the parties, and not a holding of the court. For that reason, *Hines* provides no support to the plaintiff's contention.

state. "It is a basic tenet of statutory construction that the intent of the legislature is to be found not in an isolated phrase or sentence but, rather, from the statutory scheme as a whole." *State* v. *Breton*, 235 Conn. 206, 226, 663 A.2d 1026 (1995); see also *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, 265 Conn. 127, 135, 827 A.2d 659 (2003) (in ascertaining statutory meaning, we look to, inter alia, statute's relationship to other legislation); *Waterbury* v. *Washington*, 260 Conn. 506, 557, 800 A.2d 1102 (2002) (statutes relating to same subject matter are construed so as to create rational, coherent and consistent body of law). General Statutes §§ 17a-513 through 17a-520 address when and how an individual in the custody of the department of correction may be transferred from a correctional institute to a hospital for psychiatric disabilities. For example, General Statutes § 17a-513 provides that "any person who is in the custody of the [c]ommissioner of [c]orrection" may, pursuant to the procedures set forth in General Statutes § 17a-506, petition for voluntary admission to a *"hospital for psychiatric disabilities."*[22] (Emphasis added.) In addition, § 17a-513 provides that, in the absence of a formal commitment proceeding, the individual "shall be returned *to*

---

[22] General Statutes § 17a-513 provides: "The provisions of subsection (a) of section 17a-506 shall apply to any person who is in the custody of the Commissioner of Correction provided that no such person shall be received in a hospital for observation and treatment unless a physician designated by the Commissioner of Correction notifies in writing both the Commissioner of Correction and the Commissioner of Mental Health and Addiction Services that such person is in need of observation and treatment in a hospital for psychiatric disabilities. No such person shall be confined in any such hospital for more than ten days after he has given written notice of his desire to leave, without commitment, pursuant to the provisions of section 17a-498, by the court of probate for the district wherein such person is hospitalized. In the absence of such commitment, such person, if in the custody of the Commissioner of Correction, shall be returned to any institution administered by the Department of Correction as the Commissioner of Correction shall designate, unless his custody in the Commissioner of Correction has terminated, in which case he shall be discharged."

*any institution* administered by the [d]epartment of [c]orrection" upon the completion of his voluntary stay. (Emphasis added.) The legislature's explicit differentiation between "hospital[s]" and correctional "institutions" is emphasized by General Statutes § 17a-512, which defines " 'hospital,' " as it is used in, inter alia, § 17a-513, as "a hospital for psychiatric disabilities or a mental hospital or institution administered by the [d]epartment of [m]ental [h]ealth and [a]ddiction [s]ervices." See footnote 15 of this opinion. This distinction further persuades us that a correctional institution is not an "other facility" subject to the patients' bill of rights under § 17a-540 (a).

Moreover, the legislature's very enactment of General Statutes §§ 17a-513 through 17a-520 strongly suggests a legislative expectation that inmates with psychiatric disabilities would be better served in a hospital for psychiatric disabilities, rather than in a correctional institution. See, e.g., General Statutes § 17a-513 (allowing inmate to petition for voluntary admittance to *hospital for psychiatric disability* pursuant to provisions of § 17a-506); General Statutes § 17a-514 (permitting emergency confinement *in hospital for psychiatric disabilities* of inmates of correctional institutions); General Statutes § 17a-515 (extending notice and hearing requirements to inmates committed under §§ 17a-513 and 17a-514; noting that "if the court revokes the order of commitment, the person shall be returned to *any institution* administered by the [d]epartment of [c]orrection" [emphasis added]); General Statutes § 17a-516 (any inmate that was committed to *hospital for psychiatric disabilities,* and subsequently discharged pursuant to General Statutes § 17a-510, shall be returned to *any institution* administered by department of correction).

The patients' bill of rights was enacted in 1971, and it represents "the breadth of the legislative concern

for the fair treatment of mental patients." *Mahoney* v. *Lensink*, supra, 213 Conn. 556. Sections 17a-513 through 17a-515, however, which address inmates being admitted to a hospital for psychiatric disorders either voluntarily, in an emergency, or through formal commitment procedures, were enacted in 1976. The legislature is always presumed to be aware of all existing statutes and the effect that its action or nonaction will have on any of them. *Hatt* v. *Burlington Coat Factory*, supra, 263 Conn. 310. Therefore, if a correctional institution was an "other facility" already subject to the provisions of the patients' bill of rights, the passage of §§ 17a-513 through 17a-515 would have been superfluous. Put another way, there would be no need to enact statutes addressing the transfer of an inmate from a correctional institution to a hospital for psychiatric disorders if a correctional institution was an "other facility for the diagnosis, observation or treatment of persons with psychiatric disabilities" under § 17a-540 (a).[23]

Lastly, any doubt we may have about the proper interpretation of the term "other facility" is dispelled by our review of the relevant legislative history. More specifically, we find nothing in the legislative history of the patients' bill of rights that contradicts our interpretation of "other facility," or that suggests that the legislature intended for the rights provided therein to apply to correctional institutions. Indeed, our review of sources

[23] See also General Statutes § 18-96 (providing that "[a]ny mentally ill male prisoner, transferred from [a state correctional facility] to a state mental hospital, who has completed his maximum sentence and is ready for discharge from such hospital shall be referred to the Connecticut [p]rison [a]ssociation" for assistance with reinstatement to society). This statute, which was enacted in 1949, demonstrates that even before the passage of the patients' bill of rights, the legislature expected that prisoners with psychiatric disorders would be transferred to a hospital for psychiatric disabilities, rather than remain in a correctional institution.

such as legislative hearings[24] and committee testimony[25] reveals that there was never any mention of the applicability of the patients' bill of rights to the department of correction, or to any correctional institution. See also *Mahoney* v. *Lensink*, supra, 213 Conn. 559–62 (reviewing "history attending the enactment of the patients' bill of rights").

In September, 1997, moreover, the commissioner of correction requested an opinion from the attorney gen-

[24] For example, Samuel S. Goldstein, an attorney, speaking as a past president of the Connecticut Association for Mental Health, testified: "Dignity and privacy are two fundamental rights that are often overlooked in *public institutions and mental hospitals* are no exception. It is axiomatic that administrative convenience and hospital routine mean that patients are treated often rudely by *hospital* staff members—that little provision is made for privacy in bath or toilet facilities. Patients are not afforded the chance to be alone, or given a place to store personal possessions. These routines contribute to the dehumanizing aspects of *hospitalization*." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1971 Sess., p. 641.

[25] In *Mahoney* v. *Lensink*, supra, 213 Conn. 559 n.15, we noted that the patients' bill of rights originally passed both houses in 1971 by unanimous consent without recorded discussion, and, therefore, it was appropriate to examine committee testimony for "compelling evidence about the problem, issue or purpose underlying a statute." Reviewing that testimony once again, we find no indication that the department of correction was involved in the development and enactment of the original patients' bill of rights.

In 1993, the legislature substantially amended the patients' bill of rights. See Public Acts 1993, No. 93-369 (P.A. 93-369) (concerning informed consent of patient for treatment of mental illness). While the floor debates concerning P.A. 93-369 are unrevealing, during debate before the judiciary committee, Kenneth Marcus, the deputy commissioner of mental health, testified that the proposed amendment "has been developed in collaboration with the [o]ffice of [p]rotection and [a]dvocacy, the Connecticut [p]sychiatric [s]ociety, the [l]egal [a]ssistance [r]esearch [c]enter of Connecticut, and the Connecticut [l]egal [r]ights [p]roject." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 1993 Sess., pp. 3018. Harold Schwartz, the chairman of the legislative committee of the Connecticut psychiatric society, also testified that "a number of parties . . . includ[ing] the [p]sychiatric [s]ociety, the [d]epartment of [m]ental [h]ealth, the [p]rotection and [a]dvocacy [a]gency and Connecticut [l]egal [r]ights . . . came to an agreement that we thought balanced patients' rights versus needs for treatment . . . ." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 1993 Sess., pp. 2755–56. Accordingly, not only is there no indication that the department of correction was involved in the original development and enactment of the patients'

eral regarding whether General Statutes § 17a-543 includes the department of correction and whether the term " '[f]acility,' " as defined by § 17a-540 (a), includes correctional facilities. In response to the commissioner of correction's request, the attorney general rendered an opinion stating: "A review of the statutes contained in the patients' bill of rights and an examination of the relevant legislative history and caselaw, makes it clear that these statutes were not intended to govern the care of inmates in prison mental health units." Opinions, Conn. Atty. Gen. No. 97-016 (September 26, 1997). After reviewing the same statutory provisions analyzed previously in this opinion, the attorney general noted that "[t]he focus of the legislature clearly was mental health hospitals, not correctional facilities. The specific exception [set forth in § 17a-548][26] for individuals in Whiting [Forensic Division of the Connecticut Valley Hospital (Whiting)],[27] without any mention of inmates in mental

bill of rights, there is no indication that it was involved in any subsequent amendments either.

[26] General Statutes § 17a-548 (a) provides: "Any patient shall be permitted to wear his or her own clothes; to keep and use personal possessions including toilet articles; *except for patients hospitalized in Whiting Forensic Division*; to be present during any search of his personal possessions; to have access to individual storage space for such possessions; and in such manner as determined by the facility to spend a reasonable sum of his or her own money for canteen expenses and small purchases. These rights shall be denied only if the superintendent, director, or his authorized representative determines that it is medically harmful to the patient to exercise such rights. An explanation of such denial shall be placed in the patient's permanent clinical record." (Emphasis added.)

[27] General Statutes § 17a-561 provides: "The Whiting Forensic Division of the Connecticut Valley Hospital shall exist for the care and treatment of (1) patients with psychiatric disabilities, confined in facilities under the control of the Department of Mental Health and Addiction Services, who require care and treatment under maximum security conditions, (2) persons convicted of any offense enumerated in section 17a-566 who, after examination by the staff of the diagnostic unit of the division as herein provided, are determined to have psychiatric disabilities and be dangerous to themselves or others and to require custody, care and treatment at the division and (3) *inmates in the custody of the Commissioner of Correction who are transferred in accordance with sections 17a-512 to 17a-517, inclusive,*

health units of [d]epartment of [c]orrection facilities, makes sense only if it is concluded that the patients' bill of rights does not apply to correctional facilities." Id.

"Although an opinion of the attorney general is not binding on a court, it is entitled to careful consideration and is generally regarded as highly persuasive." (Internal quotation marks omitted.) *Velez* v. *Commissioner of Correction*, 250 Conn. 536, 545, 738 A.2d 604 (1999); *State Medical Society* v. *Board of Examiners in Podiatry*, 208 Conn. 709, 720, 546 A.2d 830 (1988).[28] Despite being entitled to "careful consideration," the trial court improperly failed to give attorney general opinion No. 97-016 any consideration. This impropriety is magnified by the legislature's amendment of the patients' bill of rights subsequent to the issuance of attorney general opinion No. 97-016. More specifically, although the legislature has amended the patients' bill of rights on three

---

*and who require custody, care and treatment at the division.*" (Emphasis added.)

[28] The plaintiff claims that in the present case, attorney general opinion No. 97-016 is not entitled to "careful consideration" because the commissioner of correction adopted a portion of the patients' bill of rights into administrative directive 8.5, thereby rejecting that opinion. A review of administrative directive 8.5 reveals that the only mention of the patients' bill of rights, however, is a citation to § 17a-544 in the introductory section, which was entitled "[a]uthority and [r]eference." The citation, included in a list of thirty-seven other citations, is not followed by any substantive reference to the patients' bill of rights in the main body of the directive. Therefore, we disagree with the plaintiff's claim that administrative directive 8.5 constitutes either an adoption of the patients' bill of rights by the commissioner of correction, or a rejection of attorney general opinion No. 97-016.

Furthermore, as the defendants' forthrightly disclosed to this court, department of correction administrative directive 6.5, § 9, regarding the use of therapeutic restraints on inmates, does mirror the language of § 17a-544, even though that statute is not cited as an "[a]uthority or [r]eference" for that directive. Even if the commissioner of correction did borrow language or concepts from the patients' bill of rights when drafting administrative directive 6.5, however, this would not constitute a wholesale adoption of the patients' bill of rights by the department, or an admission that it applies to correctional institutions.

separate occasions since 1997,[29] none of those amendments sought to address the interpretation set forth in attorney general opinion No. 97-016. See *Berkley* v. *Gavin*, 253 Conn. 761, 776–77 n.11, 756 A.2d 248 (2000) (noting that presumption of legislative awareness of administrative interpretation of statute is based upon actual published opinion or ruling, and subsequent legislative amendment of that statute); *Housing Authority* v. *Dorsey*, 164 Conn. 247, 253, 320 A.2d 820, cert. denied, 414 U.S. 1043, 94 S. Ct. 548, 38 L. Ed. 2d 335 (1973) (legislature's failure to amend indicative of legislative intent). In the present case, the attorney general issued a written opinion in response to the commissioner of correction's request, and the legislature failed to make any changes to the patients' bill of rights in response to that opinion, despite making several unrelated changes. Although certainly not dispositive of the issue before us, the legislature's failure to amend the patients' bill of rights can be construed as evidence of legislative acquiescence to the conclusion set forth in attorney general opinion No. 97-016.

Furthermore, as noted by the attorney general, § 17a-548 (a) provides patients with the right to possess, inter alia, clothing, money and other personal possessions. See footnote 26 of this opinion. Within § 17a-548 (a), the legislature also provided that patients, *"except for patients hospitalized in Whiting Forensic Division* . . . [shall be permitted] to be present during any search of his personal possessions . . . ."* (Emphasis added.) We agree with the attorney general's conclusion that, by providing an exception for Whiting, and not providing a similar exception for correctional institu-

[29] See Public Acts, Spec. Sess., June, 1998, No. 98-1, §§ 15, 121 (making technical changes to § 17a-541); Public Acts 1998, No. 98-18 (amending § 17a-548 [c] to include rights to leave, to hearing and to file complaint); and Public Acts 2002, No. 02-105, § 4 (amending § 17a-543 [b] by allowing for informed consent by person designated by patient).

tions, the legislature expressed its understanding that the patients' bill of rights did not apply to correctional institutions operated by the department of correction.[30] Put another way, because the legislature included an exception for the maximum security facility[31] under the control of the department of mental health and addiction services,[32] but not for any of the correctional institutes operated by the department of correction, which have similar safety and security considerations as Whiting, and some of which provide psychiatric care services, the legislature could not have intended for the patients' bill of rights to apply to correctional institutions.[33] Accordingly, we find attorney general opinion No. 97-016 to be further " 'highly persuasive' " evidence that the provisions of the patients' bill of rights do not apply to correctional institutions. *Velez* v. *Commissioner of Correction*, supra, 250 Conn. 545.

The plaintiff and several amici curiae[34] further contend that the defendants' interpretation of the patients'

[30] As Senator Kenneth L. Przybysz stated during the legislative debate of Public Acts 1993, No. 93-119, which added the right for a patient to be present during a search of his or her possessions to § 17a-548, "what this bill now does is state that any person except those people that are hospitalized in Whiting . . . any person who is in a [d]epartment of [m]ental [h]ealth facility must be present during any search of his personal possessions." 36 S. Proc., Pt. 6, 1993 Sess., p. 2116.

[31] See *Dyous* v. *Psychiatric Security Review Board*, 264 Conn. 766, 771, 826 A.2d 138 (2003) (recognizing Whiting as "a maximum security mental health facility"); *Connelly* v. *Commissioner of Correction*, 258 Conn. 374, 406, 780 A.2d 890 (2001) (same).

[32] General Statutes § 17a-562 provides in relevant part: "Whiting . . . shall be within the general administrative control and supervision of the Department of Mental Health and Addiction Services. . . ."

[33] We emphasize, however, that despite the similarities between Whiting, which is operated by the department of mental health and addiction services, and correctional institutions operated by the department of correction, nothing in this opinion is intended to indicate—or reasonably could be read as indicating—any view regarding the application of the patients' bill of rights to individuals housed in that facility.

[34] The following parties have submitted amicus curiae briefs in support of the plaintiff's position: the commission on human rights and opportunities; the office of protection and advocacy for persons with disabilities; the

bill of rights conflicts with prior decisions of this court, as well as other state and federal courts. Again, we disagree.

Although unmentioned by the plaintiff in this section of her brief, we begin our analysis of prior cases addressing the patients' bill of rights by reviewing *Mahoney* v. *Lensink*, supra, 213 Conn. 548. In *Mahoney*, this court was called upon to address, inter alia, the certified question of whether "the enactment of General Statutes § 17-206k [an earlier version of § 17a-550][35] waive[d] the sovereign immunity of the state with respect to violations of [the patients' bill of rights] . . . ." Id., 551 n.6. Before addressing the certified question, we initially had to address whether "the substantive provisions of the patients' bill of rights encompass state mental health facilities as well as private institutions . . . ." Id., 558. Answering that question in the affirmative, we turned to the main issue before us and concluded that, based on the language of the patients' bill of rights, the purposes behind its enactment and our thorough review of its legislative history, "the legislature intended in enacting [§ 17a-550] to abrogate the state's sovereign immunity." Id., 562. Therefore, although *Mahoney* establishes that the state may be liable in a direct cause of action for a violation of the patients' bill of rights at a "state mental health facilit[y]"; id., 558; it fails to address the question of whether the patients' bill of rights also encompasses state correctional institutions. Indeed, if *Mahoney* offers any persuasive value to the present case, it is in favor of the defendants' interpretation. Specifically, in *Mahoney* this

---

Connecticut Psychiatric Society; and the Connecticut Civil Liberties Union Foundation.

[35] General Statutes § 17a-550, formerly § 17-206k, provides: "Any person aggrieved by a violation of sections 17a-540 to 17a-549, inclusive, may petition the superior court within whose jurisdiction the person is or resides for appropriate relief, including temporary and permanent injunctions, or may bring a civil action for damages."

court extensively reviewed the legislative history for the patients' bill of rights, and noted that, in 1969, the state board of mental health appointed a task force to review the administrative and professional programs of Fairfield Hills Hospital, a state mental health facility. Id., 560. The report, issued on May 15, 1970, recommended, among other things, that "the legislature enact a patient's bill of rights to resolve problems that 'may be generic to all the [s]tate *hospitals* in Connecticut.' " (Emphasis added.) Id., 561. In 1971, the legislature followed the advice of the task force, and enacted our patients' bill of rights, now codified at §§ 17a-540 through 17a-550. After reviewing both the task force report and the patients' bill of rights, we noted in *Mahoney* that "[t]he substantive provisions of the patients' bill of rights bear a close relationship to the findings of the [t]ask [f]orce." Id., 561 n.19. Accordingly, given the task force's focus on "state hospitals," and the lack of any mention of the department of correction or correctional institutions in the legislative history reviewed in *Mahoney*, we construe it as favoring the defendants' interpretation in this appeal.

Turning to the cases actually cited by the plaintiff, the plaintiff first claims that acceptance of the defendants' interpretation would force this court to "overrule its recent decision in *Phoebe G.* v. *Solnit*, [252 Conn. 68, 743 A.2d 606 (2000)] . . . ." We disagree with the plaintiff's characterization of the relevance of *Phoebe G.* to the present case. In *Phoebe G.*, the plaintiff appealed, through her next friend, from the trial court's dismissal of her complaint for lack of subject matter jurisdiction. Id., 70. In her complaint, the plaintiff sought both monetary and injunctive relief. Id. On appeal, the only two issues before this court were: "(1) whether the Superior Court has subject matter jurisdiction over a complaint brought pursuant to the patients' bill of rights or whether the Probate Court has exclusive jurisdiction;

and (2) if the Superior Court has jurisdiction, whether a next friend has standing to bring an action on behalf of a conserved person rather than her conservators." Id., 71. Although not before the court, we nonetheless noted in a footnote that the plaintiff's claim for injunctive relief against the commissioner of mental health and addiction services may have been moot because she was now a resident of the private Bidwell nursing home in Manchester. Id., 70 n.2. Therefore, on remand, the trial court needed "to determine whether the plaintiff's residential status continues to afford her protection under the patients' bill of rights . . . ." Id. More specifically, we stated that "[i]f the trial court on remand determines that the plaintiff's present residential placement qualifies as a private facility for the treatment of persons with psychiatric disabilities, she can continue to make claims under the patients' bill of rights." Id. We were not deciding whether a private nursing home was a "facility for the treatment of persons with psychiatric disabilities"; id.; but rather were merely identifying an issue that needed to be addressed on remand. Accordingly, we disagree that our opinion in *Phoebe G.* conflicts with our conclusion in the present case that a correctional institution is not a facility subject to the patients' bill of rights. The remaining cases cited by the plaintiff are similarly unpersuasive.[36]

---

[36] The plaintiff cites three Superior Court cases in support of her claim, yet none of those cases offers any persuasive value to her contention that the patients' bill of rights applies to correctional institutions. See, e.g., *Zachmanoglou v. Solnit*, Superior Court, judicial district of Danbury, Docket No. 305497 (June 30, 1995) (cited for legal proposition that patients' bill of rights "provides for a civil negligence action . . . where a plaintiff is treated in an inpatient or outpatient hospital or clinic").

Further, the plaintiff cites to *Halloran v. Armstrong*, United States District Court, Docket No. 3:01 CV 582 (D. Conn. March 29, 2002), in which the court denied the defendants' motion to dismiss and held that the commissioner and other department of correction officials may be sued in their individual capacities for violation of the patients' bill of rights. That opinion is of limited value to this court in the present appeal, however, because the underlying issue of whether a correction facility is even subject to the patients' bill of rights was not before the court in that motion to dismiss.

The Connecticut Civil Liberties Union, as amicus curiae, cites the additional case of *State* v. *Garcia*, 233 Conn. 44, 65 A.2d 947 (1995), on appeal after remand, 235 Conn. 671, 669 A.2d 573 (1996), for the proposition that the patients' bill of rights has been judicially determined to apply to the rights of psychiatrically disabled prisoners. We disagree. In *Garcia*, the defendant was found incapable to stand trial pursuant to General Statutes § 54-56d, and was committed to the custody of the commissioner of mental health for a period of three months for inpatient treatment in order to restore competency. Id., 53. The defendant appealed to this court from an order of the trial court permitting Whiting to treat him with antipsychotic medication in order to attempt to restore him to competency to stand trial. Id., 49–50. More specifically, the defendant claimed on appeal that "the trial court's order violated his rights under the federal and state constitutions because the trial court did not properly balance his liberty interest in being free from unwanted medication against the state's interest in determining his guilt or innocence." Id., 50–51. Ultimately, we concluded that, under certain circumstances, a defendant in a criminal case may be medicated against his will in order to restore him to competency, and we articulated a new standard for determining whether compelled medication is appropriate in a given case. Id., 51. *Garcia* is, therefore, distinguishable from this present case in several respects.

To begin with, the defendant's appeal in *Garcia* was not based upon the patients' bill of rights, but rather the federal and state constitutions. Indeed, prior to addressing the merits of the defendant's appeal, we first determined that the defendant had standing to bring an interlocutory appeal because he was claiming a "liberty interest, protected by the due process clause of the

In sum, we simply do not find any of the cases cited by the plaintiff to be persuasive.

constitution . . . [and, therefore, the] defendant's claimed right . . . is not a contingent right created by statute and subject to the discretion of the trial court, but is, rather, a *vested right of constitutional dimension*." Id., 66.

In attempting to establish a violation of his constitutional rights, the defendant claimed that the patients' bill of rights and our case law "arguably [define] the personal interest to refuse antipsychotic medication more expansively than simply a significant liberty interest." (Internal quotation marks omitted.) Id., 77. We disagreed, and concluded that the defendant's claim arising under state law was not any broader than his claim arising as a matter of federal substantive due process. Id. Thus, although the patients' bill of rights helped inform our analysis of the defendant's constitutional claims, our opinion in *Garcia* does not represent, as characterized by the amicus, a judicial determination that it applies to psychiatrically disabled prisoners.[37]

In addition, the defendant in *Garcia* was not a convicted felon, but rather was an individual in the custody of the commissioner of mental health after being found

---

[37] In *Garcia*, this court established a new analytical framework for determining whether compelled medication was appropriate for an incompetent defendant. Included in this framework is the requirement that the state must demonstrate that "the proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interest . . . ." *State* v. *Garcia*, supra, 233 Conn. 85. In a footnote attached to that requirement, we noted "[t]his requirement meets the mandate of the patients' bill of rights that '[e]very patient treated in *any facility for treatment of persons with a mental illness* shall receive humane and dignified treatment at all times, with full respect for this personal dignity and right to privacy. . . .' General Statutes § 17a-542." (Emphasis added.) *State* v. *Garcia*, supra, 85 n.30. Placing great emphasis on this footnote, the amicus curiae claims that *Garcia* represents a judicial determination that the patients' bill of rights applies to correctional institutions. To the contrary, the language of this footnote merely begs the question at issue in the present appeal, namely, whether a correctional institution is a "facility" subject to the provisions of § 17a-542 and the rest of the patients' bill of rights.

incompetent to stand trial for his alleged criminal behavior. Id., 46–47. After being found incompetent, the defendant was placed in Whiting, which is operated by the department of mental health and addiction services,[38] and not a correctional institution operated by the department of correction. Id., 48–49. Accordingly, our conclusion in *Garcia* was limited to a finding that *"under certain circumstances, a defendant in a criminal case* may be medicated against his will in order to restore him to competency . . . ." (Emphasis added.) Id., 51. Simply put, the issue of whether the patients' bill of rights applies to *convicted felons* confined to a *correctional institution* was not before this court in *Garcia*.

The plaintiff also claims that the defendants' interpretation of the patients' bill of rights is improper because: (1) it would be confusing and pose extreme practical difficulties to require mental health practitioners to abide by the patients' bill of rights generally, yet not when inside a correctional institution; and (2) it is wrong as a matter of public policy. Both of these arguments essentially ask this court to ignore the language and structure of the patients' bill of rights, its relation to other statutes, and the relevant legislative history, and conclude that this state would be better served with a patients' bill of rights that applies to correctional institutions providing mental health services. "For the reasons that we already have articulated, however, we are not persuaded that [the patients' bill of rights] is susceptible to the interpretation urged by the plaintiff. The determination of whether reasons of public policy exist to expand the reach of [the patients' bill of rights] to encompass [correctional institutions] is for the legislature, not this court, to make." *Ames* v. *Commissioner of Motor Vehicles*, 267 Conn. 524, 538, 839 A.2d 1250 (2004); see also *Hayes* v. *Smith*, 194 Conn. 52, 65, 480

---

[38] See footnote 32 of this opinion for the text of § 17a-562.

A.2d 425 (1984) ("Although we are sensitive to what the plaintiff is endeavoring to accomplish, the result which she asks us to reach would require this [c]ourt to legislate. This we cannot do.").

The judgment is reversed and the case is remanded to the trial court with direction to grant the defendants' motion to dismiss the ninth, tenth and eleventh counts of the plaintiff's complaint, and for further proceedings according to law.

In this opinion the other justices concurred.